UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BETHANY DePAUL, ARLENE QUARANTA, MEREDITH QUARANTA, MARGARET MERIWETHER, MINAH McBREAIRTY, and JEFFREY McBREAIRTY, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>KIMBERLY-CLARK CORPORATION,<br><br>*Defendant.* | Case No. 3:24-cv-00271-KAD<br><br>Hon. Kari A. Dooley<br><br>AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Bethany DePaul, Arlene Quaranta, Meredith Quaranta, Margaret Meriwether, Minah McBreairty, and Jeffrey McBreairty (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against Defendant Kimberly-Clark Corporation ("Defendant" or "Kimberly-Clark") based upon the investigation of Plaintiffs' counsel, information and belief, personal knowledge, and a review of publicly available information.

## INTRODUCTION

1.      Plaintiffs bring this class action against Defendant Kimberly-Clark for the claims set forth herein arising from Kimberly-Clark's intentional, reckless, and/or negligent acts and omissions in connection with the use, discharge, distribution, and/or disposal of per- and polyfluoroalkyl substances and their constituents (collectively referred to in this Complaint as "PFAS Chemicals" or "PFAS"), which have caused the contamination of real property and drinking water supplies owned and used by Plaintiffs and other members of the proposed classes set forth below (the "Class"), exposing them to dangerous levels of toxins.

2.      Plaintiffs have confirmed Kimberly-Clark's use of PFAS at its New Milford, Connecticut paper mill (and specifically PFOS and PFOA) via testing of water samples taken from

the culvert which transports water from Kimberly-Clark's landfill—where Kimberly-Clark disposed its waste for decades—to the Housatonic River. The testing shows the water runoff draining from Kimberly-Clark's landfill directly into the Housatonic River contained the following concentrations of PFAS Chemicals:

**MAY 2024 PFAS TEST RESULTS:**
**KIMBERLY-CLARK LANDFILL RUNOFF**

| PFOS | 17.4 ng/l. |
|------|------------|
| PFOA | 5.91 ng/l |

According to the EPA, these concentrations are harmful to human health because *there is no amount of PFOS or PFOA safe for humans*.

3.      Kimberly-Clark's use and disposal of PFAS has exposed Plaintiffs and members of the Class to dangerous levels of PFAS Chemicals via, *inter alia*, ingestion of PFAS-contaminated water and has contaminated Plaintiffs' and class members' real property. As a result, Plaintiffs and members of the Class have suffered injury to their bodies and property. This includes subclinical cellular injuries Plaintiffs have incurred that have substantially increased Plaintiffs' and members of the Class's risk of developing cancers and other diseases and conditions linked to PFAS Chemical exposure, as well as a loss of enjoyment of their real property because of the contamination of their soil and drinking water wells.

PARTIES

4.      Plaintiff Bethany DePaul is a Connecticut citizen domiciled in New Milford, Connecticut. Plaintiff Bethany DePaul's real property is located due east of the Kimberly-Clark New Milford Facility, less than 3 miles away. Plaintiff DePaul's real property and drinking water well supply have been contaminated with PFAS Chemicals. For years, including during the

applicable statute of limitations periods, Plaintiff DePaul ingested water from her drinking water well located on her real property, now known to be contaminated with PFAS Chemicals. As a result of her ingestion of PFAS-contaminated water from her drinking water well contaminated by Kimberly-Clark, Plaintiff DePaul has experienced subclinical cellular changes in her body that have substantially increased Plaintiff DePaul's risk of cancers and other diseases linked to PFAS Chemical exposure.

5.     Plaintiff Arlene Quaranta is a Connecticut citizen domiciled in New Milford, Connecticut. Plaintiff Arlene Quaranta's real property is located due east of the Kimberly-Clark New Milford Facility, less than 3 miles away. Plaintiff Arlene Quaranta's real property and drinking water well have been contaminated with PFAS Chemicals. For years, including during the applicable statute of limitations periods, Plaintiff Arlene Quaranta ingested water from her drinking water well located on her real property, now known to be contaminated with PFAS Chemicals. As a result of her ingestion of PFAS-contaminated water from her drinking water well contaminated by Kimberly-Clark, Plaintiff Arlene Quaranta has experienced subclinical cellular changes in her body that have substantially increased Plaintiff Arlene Quaranta's risk of cancers and other diseases linked to PFAS Chemical exposure.

6.     Plaintiff Meredith Quaranta is a Connecticut citizen domiciled in New Milford, Connecticut. For extended periods of time, including during the applicable statute of limitations periods, Plaintiff Meredith Quaranta resided on Plaintiff Arlene Quaranta's real property, which is located due east of the Kimberly-Clark New Milford Facility, less than 3 miles away. For years, including during the applicable statute of limitations periods, Plaintiff Meredith Quaranta ingested water contaminated with PFAS Chemicals from the drinking water well located on Arlene Quaranta's real property. As a result of her ingestion of PFAS-contaminated water contaminated

by Kimberly-Clark, Plaintiff Meredith Quaranta has experienced subclinical cellular changes in her body that have substantially increased Plaintiff Meredith Quaranta's risk of cancers and other diseases linked to PFAS Chemical exposure.

7.      Plaintiff Margaret Meriwether is a Connecticut citizen domiciled in New Milford, Connecticut. Plaintiff Meriwether's real property is located east-northeast of Kimberly-Clark's New Milford Facility, less than 3 miles away. Plaintiff Meriwether's real property and drinking water well have been contaminated with PFAS Chemicals. For years, including during the applicable statute of limitations periods, Plaintiff Meriwether ingested water contaminated with PFAS Chemicals from the drinking water well located on her real property. As a result of her ingestion of PFAS-contaminated water contaminated by Kimberly-Clark, Plaintiff Meriwether has experienced subclinical cellular changes in her body that have substantially increased Plaintiff Meriwether's risk of cancers and other diseases linked to PFAS Chemical exposure.

8.      Plaintiff Minah McBreairty is a Connecticut citizen domiciled in New Milford, Connecticut. Plaintiff Minah McBreairty resides at a residence whose drinking well has been designated as a monitoring well for the Kimberly-Clark Landfill due to its susceptibility to leachate from the Kimberly-Clark Landfill. For years, including during the applicable statute of limitations periods, Plaintiff Minah McBreairty ingested water contaminated with PFAS Chemicals from the drinking water well located on the real property on which she resides. As a result of her ingestion of PFAS-contaminated water contaminated by Kimberly-Clark, Plaintiff Minah McBreairty has experienced subclinical cellular changes in her body that have substantially increased her risk of cancers and other diseases linked to PFAS Chemical exposure.

9.      Plaintiff Jeffrey McBreairty is a Connecticut citizen domiciled in New Milford, Connecticut. Plaintiff Jeffrey McBreairty resided at a residence whose drinking well has been

designated as a monitoring well for the Kimberly-Clark Landfill due to its susceptibility to leachate from the Kimberly-Clark Landfill. For years, including during the applicable statute of limitations periods, Plaintiff Jeffrey McBreairty ingested water contaminated with PFAS Chemicals from the drinking water well located on the real property on which he resides. As a result of his ingestion of PFAS-contaminated water contaminated by Kimberly-Clark, Plaintiff Jeffrey McBreairty has experienced subclinical cellular changes in his body that have substantially increased his risk of cancers and other diseases linked to PFAS Chemical exposure.

10.     Defendant Kimberly-Clark Corporation is a Delaware corporation based in Texas that maintains its principal place of business at 351 Phelps Dr, Irving, TX 75038-6507.  At all times mentioned herein, Defendant Kimberly-Clark improperly used, stored, emitted, discharged, disposed of, and/or distributed PFAS Chemicals in and around New Milford, Connecticut.

<u>JURISDICTION AND VENUE</u>

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A) because this is a class action with aggregate claims exceeding $5,000,000, exclusive of interest and costs, and Plaintiffs and most members of the proposed Class are citizens of states different from Defendant Kimberly-Clark Corporation.

12.     The Court has personal jurisdiction over Defendant Kimberly-Clark Corporation because Defendant Kimberly-Clark Corporation transacts business in the United States, including in this District, is licensed to do business in this District, and has committed, and continues to commit, tortious acts in this District which have caused, and continue to cause, harm to Plaintiffs and members of the Class.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendant Kimberly-Clark transacts significant business in this District and because a substantial part of the conduct giving rise to this complaint took place within this District.

<u>SUBSTANTIVE ALLEGATIONS</u>

I.     <u>PERFLUORINATED ALKYLATED SUBSTANCES EASILY SPREAD AND PERSIST IN THE ENVIRONMENT.</u>

14.     Perfluorinated Alkylated Substances ("PFAS Chemicals" or "PFAS") are artificial chemicals resistant to, *inter alia*, biodegradation, atmospheric photooxidation, direct photolysis, and hydrolysis.

15.     PFAS Chemicals' resistance to these (and other) forces causes them to persist in the environment for long (if not indefinite) periods of time, earning them the nickname "forever chemicals."

16.     Thousands of PFAS Chemicals have been developed and produced, but the two most widely used PFAS Chemicals are Perfluorooctanoic Acid ("PFOA") and Perfluorooctane Sulfonate ("PFOS").

17.     PFOA and PFOS were developed in the 1940s and 1950s and have been added to and/or used in products such as metal coatings, clothing, furniture, adhesives, food packaging, paper products, heat-resistant non-stick cooking surfaces, insulation of electrical wire, and many other products due to the ability of PFOA and PFOS to repel water, dirt, oil, and grease, resist heat, and protect surfaces.

18.     PFAS Chemicals easily cycle through the environment via air, water, soil, and sediments, with primary sources of contamination stemming from manufacturing sites.

19.     PFAS Chemicals are water soluble: Once PFAS Chemicals enter a body of water, they easily spread throughout the body of water or water system and remain unless and until the

PFAS Chemicals are actively removed. As a result, drinking water contamination is a common way people are exposed to PFAS Chemicals.

20.     Typical water treatment and filtration systems do not filter PFOS and PFOA from contaminated water due to the chemicals' physical and chemical properties.

21.     Likewise, chlorine and other disinfectants that are often added to drinking water systems are not capable of removing, and do not remove, PFOS or PFOA.

22.     PFAS Chemicals also spread through the air. The Connecticut Department of Energy and Environmental Protection ("CT DEEP") has recognized that "[i]industrial emissions and solid waste incineration may release PFAS to the air, which can then travel long distances before eventually settling back down onto land through a process called 'atmospheric deposition' or through contaminated snow and rainwater," which is part of why PFAS is such "an environmental problem."[1]

23.     Figure 1, below, illustrates how stack emissions containing PFAS Chemicals lead to environmental PFAS contaminations:

**FIGURE 1**



---

[1] https://portal.ct.gov/DEEP/Remediation--Site-Clean-Up/Contaminants-of-Emerging-Concern/DEEP-PFAS-Homepage

24.     The EPA has studied PFAS transport through the air, confirming that PFAS air emissions, transport, and deposition can lead to the contamination of surface and ground water.[2]

25.     PFAS Chemicals also spread via groundwater. PFAS Chemicals can leach into soil and, from there, enter groundwater systems. Once PFAS have contaminated groundwater, they can spread through aquifers, which are layers of water-bearing permeable rock, sand, or gravel from which groundwater can be extracted.

II.     <u>PFAS CHEMICALS ARE HARMFUL TO HUMAN HEALTH</u>.

26.     Human exposure to PFAS Chemicals can occur in several ways, including drinking water contaminated with PFAS, breathing air containing PFAS, and eating certain foods that may contain PFAS.

27.     PFOS and PFOA accumulate in humans' blood and organs, including the kidneys and the liver, and interfere with the human body's functions, including the functions of organs and immune systems, leading to adverse health outcomes.

28.     Peer-reviewed studies reflecting the most recent and best scientific understanding of PFAS Chemicals' impact on human health consider *any* amount of PFAS Chemical exposure, including exposure to PFOS and PFOA, to be hazardous to human health. In fact, negative health effects may occur because of exposure to PFOA or PFOS in drinking water at levels near zero and below most laboratories' ability to detect at this time. In other words, exposure to a detectable amount of PFAS Chemicals, including PFOA and PFOS, is hazardous to human health.

29.     The following is a non-exhaustive list of adverse human health outcomes that can result from exposure to PFOS and PFOA, many of which can manifest years after exposure:

---

[2] https://www.epa.gov/cmaq/simulating-pfas-fate-and-transport-air-cmaq

a.   reproductive effects such as decreased fertility or increased high blood pressure in pregnant women;

b.   developmental effects or delays in children, including low birth-weight, accelerated puberty, bone variations, or behavioral changes;

c.   increased risk of kidney cancer, testicular cancer, thyroid cancer, prostate cancer, bladder cancer, breast cancer, ovarian cancer;

d.   reduced ability of the body's immune system to fight infections, including reduced vaccine response;

e.   interference with the body's natural hormones and liver enzymes;

f.   increased cholesterol levels and/or risk of obesity;

g.   changes in liver enzymes;

h.   increased risk of high blood pressure or pre-eclampsia in pregnant women;

i.   interference with; and

j.   suppression of vaccine response (decreased serum antibody concentrations) in children.

30.   PFOA has additionally been observed to cause Leydig cell tumors, pancreatic cancer cell tumors, and hepatocellular adenomas in rats.

31.   PFOS has additionally been observed to cause potentially human relevant tumors, including hepatocellular tumors in male and female rats and pancreatic islet cell carcinomas in male rats.

32.   Concerns over potential adverse health effects from PFAS Chemicals on humans grew in the early 2000s with the discovery of PFOA and PFOS in laboratory studies of human

blood. In 2009, the EPA published provisional health advisories for PFOA and PFOS, based on evidence available at that time. The EPA noted that levels of 0.04 ppb in tested sites were "not of concern," and the EPA set the PFOS provisional health advisory at a level of 0.2 ppb and the PFOA provisional health advisory at a level of 0.4 ppb.[3]

33.     In 2016, the EPA issued a revised health advisory, "identify[ing] the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure [as] 0.07 parts per billion (70 parts per trillion) for both PFOA and PFOS."[4]

34.     On June 15, 2022, the EPA released four drinking water health advisories for PFAS, updating and replacing its 2016 PFOA and PFOS advisories based on new science. The updated EPA advisory stated, "some negative health effects may occur with concentrations of PFOA or PFOS in water that are near zero and below EPA's ability to detect at this time."

35.     The EPA continues to enact more stringent PFAS regulations in order to "prevent thousands of deaths and reduce tens of thousands of serious PFAS-attributable illnesses."[5]

36.     On April 10, 2024, the EPA announced a tightened standard for PFAS Chemical exposure, setting the enforceable Maximum Contaminant Levels ("MCL") for PFOA and PFOS in drinking water at 4.0 ng/l to "prevent PFAS exposure in drinking water for approximately 100 million people, prevent thousands of deaths, and reduce tens of thousands of serious PFAS-attributable illnesses."[6] Because the EPA's position is that no level of PFOA or PFOS exposure is

---

[3] https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf
[4] https://www.govinfo.gov/content/pkg/FR-2016-05-25/pdf/2016-12361.pdf
[5] https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas
[6] https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas#General

safe for humans, the Maximum Contaminant Level Goal ("MCLG") set by the EPA for PFOA and PFOS is *zero*.[7]

37.     Using the "the best available science on PFAS," the EPA has determined that, as a result of the reduction of PFAS exposure through drinking water, "[f]ewer people will get cancer or liver disease, pregnant women will have reduced risks, and more and children and infants will be stronger and grow healthier," and there will be "lower incidents of heart attacks and strokes," as well as additional "developmental, cardiovascular, liver, immune, endocrine, metabolic, reproductive, musculoskeletal, and carcinogenic effects."[8]

III.     KIMBERLY-CLARK USED PFAS AT ITS NEW MILFORD FACILITY AND DUMPED PFAS-LADEN WASTE AT THE KIMBERLY CLARK LANDFILL.

38.     Plaintiffs tested the runoff from the short fiber paper sludge waste generated by Kimberly-Clark in New Milford. The results conclusively show that Kimberly-Clark used PFAS, including PFOS and PFOA specifically, in manufacturing products at its New Milford facility, which includes diapers, tissue paper, and feminine products. These tests are discussed in further detail below.

39.     Kimberly-Clark has operated and produced paper goods at the manufacturing facility at 58 Pickett District Road, New Milford, Connecticut (the "New Milford Facility") since the late 1950s.

40.     The New Milford Facility is situated on a nearly 60-acre parcel bordering the Housatonic River, a body of water that is 149 miles long and spans almost 2,000 square miles from its source in the Berkshires, through Connecticut, to Long Island Sound.

---

[7] https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas.
[8] https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_fact-sheet_general_4.9.24v1.pdf

41.     Kimberly-Clark describes the New Milford Facility as "an integral part of New Milford for 50 years," employing over 350 workers.

42.     The New Milford Facility has historically made diapers, feminine products, and tissue products for popular household brands such as Kleenex, Scott, and Huggies.[9] Currently, it exclusively manufactures tissue paper, producing nearly one million cartons of Kleenex facial tissues per day.

43.     It is unsurprising that the short fiber paper sludge waste generated by Kimberly-Clark for decades contains PFAS, including PFOS and PFOA, as diapers, feminine products, and tissue paper products are known to traditionally utilize and/or contain types of PFAS Chemicals in their manufacturing processes. For example, diapers typically include a layer of paper lining which has been treated with PFAS to prevent liquid from soaking through them. Additionally, paper used in diapers, toilet paper and facial tissues used PFAS chemicals as wetting agents and for other purposes. Kimberly-Clark has reported using an average of 825 gallons per month and 9900 gallons a year of wetting agent during tissue production at the New Milford Facility.  Kimberly-Clark is also the only facility in New Milford that operates on a large enough scale to cause the levels of contamination present in the area.

44.     Kimberly-Clark's confirmed use of PFAS in New Milford is consistent with contamination incidents elsewhere in the United States involving Kimberly-Clark tissue paper manufacturing. For example, Kimberly-Clark previously manufactured tissue paper at a facility located in Fullerton, California, which Kimberly-Clark closed in 2020. Upon the closing of the Fullerton, California Kimberly-Clark tissue paper plant in 2020, local officials discovered that a large drinking water well located adjacent to the Fullerton Kimberly-Clark site (which supplied

---

[9] https://investor.kimberly-clark.com/news-releases/news-release-details/kimberly-clarks-energy-independence-project-begins-providing.

over 75% of the drinking water supply for local water agencies) was contaminated with dangerous levels of PFAS Chemicals in similar concentrations to those found in the Kimberly-Clark Landfill runoff, requiring immediate remediation to make the drinking water safe for human consumption.[10]

45.   The PFOS and PFOA levels detected at the former Kimberly-Clark Fullerton tissue paper mill are similar to those detected in New Milford:

**Fullerton, California Kimberly-Clark Well 1A**
**PFAS Test Results[11]**

| | |
|---|---|
| PFOA | 8.3 ng/L |
| PFOS | 19.2 ng/L |

46.   Kimberly-Clark manufacturing processes result in substantial air emissions which exit the Kimberly-Clark facility via emissions stacks. These emissions include PFAS Chemicals.

47.   Kimberly-Clark's disposal of PFAS-contaminated waste also resulted in groundwater and surface water contamination.

IV.    KIMBERLY-CLARK'S PAPER MILL WASTE CONTAMINATED THE LAND AND WATER SURROUNDING THE KIMBERLY-CLARK LANDFILL.

48.   Kimberly-Clark owns a 165-acre landfill site located on Kent Road in New Milford (the "Kimberly-Clark Landfill"). The Kimberly-Clark Landfill is located a short distance up the road from the New Milford Facility. According to publicly filed records with CT DEEP, Kimberly-Clark dumped "short fiber paper sludge"—a byproduct of the paper manufacturing process that is notorious for containing high concentrations of PFAS Chemicals—at the Kimberly-Clark Landfill.

---

[10] *See, e.g.*, La Tour, Jesse, *PFAS Extraction Plant Installed at Former Kimberly Clark Site*, Fullerton Observer (Apr. 23, 2021), https://fullertonobserver.com/2021/04/23/pfas-extraction-plant-installed-at-former-kimberly-clark-site/ ("The city of Fullerton and the Orange County Water District (OCWD) have installed a wellhead filtration/treatment plant to remove PFOS (perfluorooctane sulfonate) and PFOA (perfluorooctanoic acid) from local well water, at the former Kimberly Clark site.").
[11] https://fullertonobserver.com/2022/11/16/ocwd/.

Testing of the runoff from the Kimberly-Clark Landfill confirms that the landfill is leaching dangerous levels of PFAS chemicals into the surrounding water supply and into the Housatonic River.

49.     Kimberly-Clark purchased the parcel where the Kimberly-Clark Landfill is located in 1969 and operated an active short fiber paper sludge disposal operation at the site from 1969 to 2010. The parcel is located in a rural area dominated by unimproved land and residences. There are not now nor ever have there been any other industrial facilities at or in the proximity to the Kimberly-Clark Landfill.

50.     The western edge of the Kimberly-Clark Landfill abuts a high, pristine, undeveloped ridge which forms the whole western boundary of the site.  The northern boundary abuts residential parcels, and the southern boundary abuts unimproved land. The eastern boundary of the property abuts Route 7, with the Housatonic River located a short distance to the east of Route 7, as illustrated in Figure 2 below:

**FIGURE 2**



51.    CT DEEP issued a permit to Kimberly-Clark for operation of the landfill on November 14, 1983, and a modified permit on February 9, 1984 (the "Landfill Permits"). The Landfill Permits permitted Kimberly-Clark to dispose of short fiber paper mill sludge originating from the New Milford Facility only. Meaning that all contents of the Kimberly-Clark Landfill came from Kimberly-Clark's New Milford Facility.

52.    Kimberly-Clark ceased dumping paper mill sludge at the Kimberly-Clark Landfill in 2010, and it was thereafter capped with 24 inches of fill and closed in 2017.

53.     The Landfill Permits required Kimberly-Clark to maintain water quality monitoring wells on the property to track and observe water quality in those wells and in the wells of neighboring residences for any contamination caused by the contents of the landfill.

54.     The Landfill Permits also required Kimberly-Clark to monitor the water quality in the wells of five private residences located between Route 7 and the Housatonic River to the east of the Kimberly-Clark Landfill, as well as two surface diversion streams on the property, referred to as the North and South Streams. One of the designated monitoring wells—Monitoring Well B— is located on the property Plaintiffs Minah McBreairty and Jeffrey McBreairty reside and resided at, respectively. Figure 3 below shows the monitoring wells Kimberly-Clark was required to test periodically to monitor leachate from the Kimberly-Clark Landfill, with Monitoring Well B highlighted:

### FIGURE 3



16

55. Kimberly-Clark's monitoring, as confirmed by filings with the State of Connecticut, established that the surrounding residences' wells were sensitive to leachate from the Kimberly-Clark Landfill. That is, chemicals detected in the private residential monitoring wells—including Monitoring Well B—match the chemical signatures present in Kimberly-Clark's short fiber paper sludge dumped at the Kimberly-Clark Landfill.

56. Documents filed by Kimberly-Clark demonstrate the parcel on which the Kimberly-Clark Landfill sits is underpinned with bedrock which is approximately 15-90 feet below the surface. The soil in the layer over the bedrock is moderately transmissive, and critically, the landfill is *not lined*, which increases the risk that PFAS Chemicals in the landfill will impact the soil and groundwater in and around the property.

57. The hydrology of the Kimberly-Clark Landfill dictates that groundwater moves from west to east—from the Kimberly-Clark Landfill to the Housatonic River. Kimberly-Clark specifically designed the Kimberly-Clark Landfill so that surface water collects in two diversion streams which connect into one stream in the northeastern part of the Kimberly-Clark Landfill to which then dumps into the Housatonic River in the area of the Boardman Bridge. This waterflow is illustrated in Figure 4, below, with the arrows showing water direction as well as the runoff streams highlighted for ease of reference:

## FIGURE 4



58.     Because we now know this water is contaminated with PFAS (and specifically, PFOS and PFOA), this means that the Kimberly-Clark Landfill is dumping PFAS-contaminated water into the Housatonic River on a continuous basis in addition to contaminating nearby private drinking wells such as Monitoring Well B.

59.     Water monitoring tests performed by Kimberly-Clark demonstrate that the residential monitoring wells—including Monitoring Well B—are sensitive to runoff from the landfill. In other words, the leachate from the Kimberly-Clark Landfill has affected, and continues to affect, the surface and groundwater quality in the area of the site and beyond. In particular, Ph, alkalinity, chloride, conductivity, total dissolved solids, total suspended solids, iron, and sodium

levels have been increased by the landfill sludge leachate in the downgradient landfill monitoring and private wells.

60.     PFAS contamination emanating from the Kimberly-Clark Landfill not only directly impacts the land and water supplies nearest to the landfill property, but also travels distances further away once it enters groundwater or surface water.

V.     KIMBERLY-CLARK'S USE AND DISPOSAL OF PFAS CREATED AN ONGOING POLLUTION CYCLE IN THE NEW MILFORD AREA.

61.     Kimberly-Clark's improper use and disposal of PFAS Chemicals created an ongoing cycle of pollution between the Kimberly-Clark Landfill and the New Milford Facility, as well from the grounds of the New Milford Facility into the air.

62.     As depicted in Figure 5, below, the Kimberly-Clark Landfill is located approximately 3.5 miles upstream from the New Milford Facility. Both properties sit along the Housatonic River.

**FIGURE 5**



63.     Kimberly-Clark used PFAS Chemicals, including PFOA and PFOS, in its manufacturing processes at the New Milford Facility, and then transported and dumped its PFAS-laden paper mill sludge into the unlined Kimberly-Clark Landfill.

64.     Because the Kimberly-Clark Landfill is not lined, PFAS Chemicals leached into landfill soil on the property and surrounding properties, into the groundwater, and into nearby bodies of water, including the Housatonic River.

65.     Water is essential to Kimberly-Clark's product manufacturing process. For example, to create its tissue paper products, Kimberly-Clark adds "lots of water" to individual fibers or "pulp" that have been pressed into sheets.[12]

66.     At the New Milford Facility, Kimberly-Clark uses water it draws in from the Housatonic River for its manufacturing processes.

67.     This is the same water that only a few miles upstream, Kimberly-Clark's Landfill is actively contaminating with dangerous levels of PFAS Chemicals, as demonstrated by the test results from the drainage culvert discussed herein.

68.     PFAS Chemicals in the Housatonic River also remained downstream of the Kimberly-Clark Landfill by bounding to river sediments. This is particularly the case for long-chain PFAS such as PFOS, which are known to cling to organics. The PFAS bound to the sediment can remain bound and be released into the water over an indefinite period of time.

69.     As a result of the above, a continuous pollution cycle formed between the Kimberly-Clark Landfill and the New Milford Facility, whereby Kimberly-Clark used PFAS Chemicals in its manufacturing processes at the New Milford Facility and dumped PFAS-contaminated paper mill sludge from the New Milford Facility in the unlined Kimberly-Clark

---

[12] https://www.kimberly-clark.com/-/media/kimberly/pdf/ingredients/how-tissues-are-made.pdf.

Landfill. The PFAS Chemicals then leached into the soil and groundwater of the Kimberly-Clark Landfill and entered, among other areas, the Housatonic River. Kimberly-Clark then drew in PFAS-contaminated water from the Housatonic River, which due to the ability of PFAS to bound to river sediments will remain contaminated for an indefinite period of time, to use in its production process. After using the PFAS-contaminated water in conjunction with PFAS Chemicals to produce its products, Kimberly-Clark then dumped PFAS-laden waste from the New Milford Facility at the Kimberly-Clark Landfill. And so, the cycle continued as illustrated in Figure 6:

**<u>FIGURE 6</u>**



70.     A secondary cycle of pollution formed through Kimberly-Clark's release of PFAS into the air by stack emissions. Kimberly-Clark used PFAS contaminated water *and* PFAS Chemicals in its manufacturing processes, as described above. Kimberly-Clark used incinerators as part of its production process, resulting in gases and solids being released into the atmosphere via the New Milford Facility's smokestacks. Because Kimberly-Clark makes no efforts to prevent PFAS from exiting the facility via the smokestacks, PFAS-laden dust and residue produced by

paper and diaper machines at the New Milford Facility is exhausted into the atmosphere during the incineration process. As described herein, because stack emissions cause PFAS Chemicals to travel great distances away from the incineration site, PFAS Chemicals were spread to land and water supplies that otherwise might be unaffected by groundwater contamination. This secondary cycle of pollution is illustrated in Figure 7:

**FIGURE 7**



PFAS contaminated water from the Housatonic River is used by Kimberly-Clark at the New Milford Facility

Airborne PFAS-contaminated stack emissions travel to surrounding elevated terrain, contaminating soil

PFAS leaches from real property into surrounding area's water table and drinking water wells

71.     Crucially, because the Kimberly-Clark Landfill is actively polluting the Housatonic River, the above contamination cycle will continue as long as the New Milford Facility draws water from the contaminated Housatonic River which Kimberly-Clark is polluting upstream, and releases unfiltered stack emissions.

72.     As a result of the above, Kimberly-Clark's continued improper use and disposal of PFAS Chemicals from the New Milford Facility and at the Kimberly-Clark Landfill released PFAS into soil, groundwater, surface water, and air, causing widespread contamination in the area of New Milford.

22

A.  TESTING CONFIRMS PRESENCE OF PFAS CHEMICALS IN THE SURFACE AND GROUNDWATER SURROUNDING THE KIMBERLY-CLARK LANDFILL.

73.      Testing of the groundwater and surface water in the area of the Kimberly-Clark Landfill demonstrates that the paper mill sludge that was transported from the New Milford Facility and dumped in the Kimberly-Clark Landfill contains PFAS Chemicals.

74.      The PFAS-laden leachate from the Kimberly-Clark Landfill has contaminated the main drainage stream which flows into the Housatonic River.

75.      In May 2024, Plaintiffs tested for the presence of PFAS Chemicals in the water emanating from the main drainage stream for the Kimberly-Clark Landfill in the area of the Boardman Bridge on Route 7 in New Milford, where the drainage stream enters the Housatonic River. This stream is formed after the confluence of the North and South Streams located on the Kimberly-Clark Landfill, which are the two surface water drainage sources for the landfill. The culvert's path (blue dashed line) and point of entry into the Housatonic River (red shaded circle) is depicted in Figure 8, below:

**FIGURE 8**



76.    The following photographs show the location the sample was taken: where the Kimberly-Clark Landfill drainage enters into the Housatonic River



77.    Laboratory testing of the water flowing from the Kimberly-Clark Landfill drainage culvert into the Housatonic River taken at the point depicted by the shaded red circle in Figure 8 revealed the presence of PFAS Chemicals well above current EPA action level standards (which consider no amount of PFOS or PFOA exposure safe, with PFOA at 5.91 ng/l and PFOS at 17.4 ng/l:

**KIMBERLY CLARK LANDFILL RUNOFF<br>CULVERT TEST RESULTS: MAY 2024**

| | |
|---|---|
| PFOS | 17.4 ng/l. |
| PFOA | 5.91 ng/l |

78.     Because the Kimberly-Clark Landfill contains only short fiber paper mill sludge from Kimberly-Clark's New Milford Facility, these test results conclusively establish that Kimberly-Clark used PFAS in its manufacturing processes at the New Milford Facility.

79.     Additionally, given that Kimberly-Clark ceased dumping at the Kimberly-Clark Landfill in 2010—fourteen years ago—the levels of PFAS present in the water in the area of Boardman Bridge while the Kimberly-Clark Landfill was active were, based on scientific understanding, significantly higher than in its current dormant state.

80.     The PFAS-laden leachate from the Kimberly-Clark Landfill also has contaminated a private drinking water well located to the east of the landfill site.

81.     Specifically, in May 2024, Plaintiffs tested the private well located on Kent Road in New Milford designated as Monitoring Well B by Kimberly-Clark  for the presence of PFAS Chemicals.

82.     Historical monitoring reports demonstrate how landfill leachate has contaminated the Monitoring Well B.  That is, the well was downstream of the groundwater flow from the Kimberly-Clark Landfill and had certain high parameter results consistent with the chemistry of the paper mill sludge that was dumped at the landfill as compared to the testing results of the upgradient monitoring wells.

83.     The laboratory testing results from the May 2024 samples of the Monitoring Well B revealed the presence of PFAS Chemicals that are above current EPA action level standards:

**MONITORING WELL B TEST
RESULTS: MAY 2024**

| PFOS | 8.74 ng/l. |
|------|------------|
| PFOA | 4.83 ng/l |

As with the results of the water in the area of Boardman Bridge, the testing results of the water in the Monitoring Well B demonstrate that the sludge that Kimberly-Clark dumped at the landfill contained PFAS Chemicals.

84.     Additionally, given that Kimberly-Clark ceased dumping at the Kimberly-Clark Landfill in 2010, the levels of PFAS present in the Monitoring Well B while the Kimberly-Clark Landfill was active were, based on current scientific understanding, significantly higher than in its current dormant state.

> **B.  KIMBERLY-CLARK CONTAMINATED NEW MILFORD RESIDENTS' LAND AND WATER WITH TOXIC PFAS CHEMICALS THROUGH AIR EMISSIONS.**

85.     In addition to groundwater contamination, Kimberly-Clark's manufacturing practices caused stack emissions containing PFAS Chemicals to go airborne, travel, and ultimately deposit PFAS Chemicals on the real property and in the drinking water wells of Plaintiffs Bethany DePaul, Arlene Quaranta, and Margaret Meriwether, and the members of the Class.

86.     The stack emissions from the Kimberly-Clark mill in New Milford resulted from insufficient filtering of PFAS laden dust produced by paper and diaper machines which was then exhausted into the atmosphere.

87.     The PFAS Chemicals deposited by Kimberly-Clark's stack emissions contaminated the soil and drinking water wells located on Plaintiffs' and members of the Class's properties through the following process: the pollutant plume released from the stack is dispersed and

transported through the atmosphere to ground-level receptors mainly by advection (driven by wind) and diffusion (driven by concentration gradient). The higher the dispersion of the plume, the lower the pollutant concentration will be. These plume dispersion and transport mechanisms and the resulting travel time and distance it takes for the plume to reach a ground-level receptor are dependent on multiple factors and their interplay.

88.     Plaintiffs Bethany DePaul, Arlene Quaranta, and Meredith Meriwether all live east of the Kimberly-Clark New Milford Facility (the direction of the dominant wind for half the year) within the area shaded red to the east of the New Milford Facility in Figure 9 below at elevations varying from nearly 500 feet to 750 feet:

**FIGURE 9**



89.     The key factors which dictate dispersion include: (1) the stack/release height, which determines the vertical distance available for dispersion before the plume reaches the ground; (2) buoyancy and momentum of the plume exiting the stack, which cause the plume to rise up vertically as it exits the stack and remain in the atmosphere for longer duration and distance before

it starts descending towards the ground; (3) presence of nearby structures and their size and location relative to the source/stack, which can drag down the plume closer to the source; (4) meteorology; and (5) surrounding terrain/ground elevations (receptors at higher elevation will catch a more concentrated plume). These factors not only determine the maximum ground level concentration of the pollutant, but also the location of that maximum ground level concentration.

90.     The profile of ground level concentration versus distance from the stack typically follows a bell or hill shape - the concentration first increases with increasing distance from the stack, peaks, then decreases and eventually plateaus. The height of the peak (maximum concentration) and the distance of the peak from the stack (location of maximum receptor) is determined by the five factors listed above.

91.     As a result, through Kimberly-Clark's stack emissions, the concentration of PFAS contamination increased with increasing distance from the stack, before decreasing and eventually plateauing. In other words, the land immediately surrounding the Kimberly-Clark Facility may reveal lower levels of PFAS concentrations—because at least initially, dispersion through air causes increasing contamination with increasing distance before tapering off.

92.     The contamination of the drinking well water on the properties of Plaintiffs Bethany DePaul, Arlene Quaranta, and Margaret Meriwether and members of the Class through stack emissions caused individuals ingesting water originating from those wells to be exposed to unsafe levels of PFAS Chemicals.

93.     This progression of contamination (*i.e.,* air to soil to groundwater) is consistent with other known examples of stack emissions depositing PFAS Chemicals.

94.     Stack emissions also include those gases and solids that come out of a smokestack after the incineration process. PFAS from the smokestack can attach to particles or dissolve in rain

and snow, which are then deposited to land and water from the air – a process known as atmospheric deposition.

95.     Stack test data from states like North Carolina, New Hampshire, and New York have confirmed PFAS emissions from smokestacks and that sources include PFAS manufacturing facilities and large industrial users of PFAS-containing products.[13]

96.     North Carolina also discovered atmospheric deposition of PFAS many miles downwind from a manufacturing facility,[14] indicating that emissions from manufacturing facilities like Kimberly-Clark's New Milford Facility can cause PFAS contamination throughout a widespread area.

97.     Saint-Gobain Performance Plastics, manufacturer of advanced plastics containing PFAS, is one example of how readily PFAS can travel through stack emissions. The New Hampshire Department of Environmental Services ("NHDES") has reported that:

> [I]n 2004, Saint-Gobain conducted stack tests using testing and analytical methods that had recently been developed to evaluate the potential PFOA emissions from three coating towers at the facility. Upon review of the emissions detected, Saint-Gobain reported to NHDES that the emissions from the entire facility were predicted to exceed the ambient air limits (AALs) established in Env-A 1400, Regulated Toxic Air Pollutants. NHDES issued an Administrative Order by Consent to Saint-Gobain, which required reformulation of coatings to reduce PFOA content by the end of 2006. Additional stack testing was conducted in 2007, at which time Saint-Gobain demonstrated compliance with the AALs using the information from the stack test and air dispersion modeling. As a result, PFOA emissions were reduced by more than 96% from 2004 levels.[15]

98.     In investigating the Saint-Gobain PFAS contamination crisis, the U.S. Department of Health and Human Services ("Dept. of HHS") also confirmed that "[g]roundwater contamination is presumed to have occurred due to PFAS released from air stacks at the facility

---

[13] https://www.michigan.gov/-/media/Project/Websites/PFAS-Response/Workgroups/Air-Quality/FAQ-Air-Quality-Related-Issues.pdf?rev=cbd9c3f0d4f04a9699d288ab5b38f056
[14] https://www.michigan.gov/pfasresponse/faq/categories/pfas-related-air-quality-issues
[15] https://www.pfas.des.nh.gov/pfas-occurrences/saint-gobain-performance-plastics/site-investigation-history

depositing on soil and filtering down to the groundwater," and the "pathway could have been a significant source of exposure, especially in the past before emissions controls were installed."[16]

99. The Dept. of HHS further warned that humans could still "be exposed today if they come in contact with soil, surface water, or sediment contaminated by past air releases" from the Saint-Gobain facility,[17] indicating that spread by air emissions—which can deposit PFAS Chemicals miles away—results in long lasting risks to human health.

100. The Dept. of HHS provides an explanation of the steps that lead to PFAS exposure from private well drinking water, beginning with stack emissions:[18]

 a.  Source – Releases of PFAS from the site into the air.

 b.  Transport – PFAS dispersing in air, settling onto the ground, and washing down into underlying groundwater used for drinking water for private wells.

 c.  Exposure Point – Drinking water taps of people living in the area using private wells.

 d.  Exposure Route – Ingestion of drinking water provided by private wells.

 e.  Exposed Population – People living or working in the area who drink or drank water from private wells.

101. New Milford, Connecticut has a dominant easterly wind for half the year, during the winter and spring months.

102. The properties of Plaintiffs Arlene Quaranta, Bethany DePaul, and Margaret Meriwether are located due east of the Kimberly-Clark New Milford Facility, under 3 miles away,

---

[16] U.S. Department of Health and Human Services Agency for Toxic Substances and Disease Registry, Office of Community Health and Hazard Assessment, *Evaluation of Per-and Polyfluoroalkyl Substances (PFAS) in Private Wells near the Saint Gobain Performance Plastics Site in Southern New Hampshire*, November 17, 2023, available at https://www.atsdr.cdc.gov/HAC/pha/StGobainPlastics/StGobain-PFAS-private-well-HC-508.pdf
[17] *Id.*
[18] *Id.*

and are elevated several hundred feet above both sea level and the Kimberly-Clark New Milford Facility.

103.    The elevation levels of Plaintiff DePaul's, Plaintiff Arlene Quaranta's, and Plaintiff Margaret Meriwether's properties are consistent with elevation levels likely to experience PFAS Chemical contamination from stack emissions where stack emissions containing PFAS Chemicals exist.

104.    Additionally, as the prior stack emission contamination incidents discussed above have shown, 3 miles is well within the area likely to be affected by Kimberly-Clark's stack burning emissions.

105.    Kimberly-Clark's New Milford Facility is the only plausible stack-emission emitting industry in the area capable of spreading PFAS contamination to nearby properties' soil and private drinking water wells, like the PFAS contamination by Saint-Gobain.

106.    Additionally, the elevation of the properties of Plaintiff DePaul, Plaintiff Arlene Quaranta, and Plaintiff Margaret Meriwether means that is extremely unlikely that PFAS contamination could have come from any source other than stack emissions as there has been no known dumping of materials containing PFAS Chemicals on their properties, and they are not downstream of any body of water known to be contaminated with PFAS Chemicals.

VI.    LABORATORY   TESTING   CONFIRMS   PFAS   CONTAMINATION   OF PLAINTIFFS' LAND AND WATER.

A.   *Laboratory Testing Confirms the Soil on Plaintiff DePaul's and Plaintiff Arlene Quaranta's Real Property is Contaminated with PFAS Chemicals.*

107.    Providing further confirmation of the PFAS Chemical contamination caused by Kimberly-Clark's New Milford Facility are the results of December 2023 testing of soil samples taken throughout the area surrounding the New Milford Facility, including on Plaintiff DePaul's and Plaintiff Arlene Quaranta's properties.

108.    This testing confirmed the presence of PFAS Chemicals in the soil on Plaintiff DePaul's and Plaintiff Arlene Quaranta's real property. Samples were taken from 0 to 6 inches beneath the surface of the ground at five locations in New Milford to the north, south, east, and west of the New Milford Facility (the "Soil Samples"). The five locations of the Soil Samples included Plaintiff DePaul's and Plaintiff Arlene Quaranta's two residences and three public parks near the New Milford Facility. The results of the December 2023 testing revealed the presence of PFOA and/or PFOS in all Soil Samples, including as follows:

a.   Soil Sample 1, taken from a park located off of Route 202, West of the New-Milford Facility [GEO-1]: PFOS 6.54 ng/L and PFOA 3.81 ng/L.

b.   Soil Sample 2, taken at Lovers Leap Park, located approximately 2 miles South of the New Milford Facility [GEO-2]: PFOA 3.59 ng/L.

c.   Soil Sample 3, taken from Addis Park, located directly across the Housatonic River from the New Milford Facility [GEO-3]: PFOS 6.63 ng/L and PFOA 5.88 ng/L.

d.   Soil Sample 4, taken from Plaintiff DePaul's residence [GEO-4]: PFOS 7.71 ng/L and PFOA 9.57 ng/L.

e.   Soil Sample 5, taken from Plaintiff Arlene Quaranta's residence [GEO-5]: PFOS 9.69 ng/L and PFOA 6.52 ng/L.

109.    Each Soil Sample location is within 3 miles of Defendant Kimberly-Clark's New Milford Facility.

110.    Soil Sample GEO-4 and Soil Sample GEO-5—the samples from Plaintiffs' real property—returned results showing dangerous, toxic levels of PFAS Chemicals. The testing results from all five sampling locations are below, with chemical concentrations listed in mg/kg:

**DECEMBER 28, 2023 SOIL SAMPLE**
**TEST RESULTS**

| Chemical | SAMPLE GEO-1 | SAMPLE GEO-2 | SAMPLE GEO-3 | SAMPLE GEO-4 | SAMPLE GEO-5 |
|---|---|---|---|---|---|
| PFBS | ND (<0.000274) | ND (<0.000286) | ND (<0.000342) | ND (<0.000378) | ND (<0.000312) |
| PFBA | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| PFDS | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| PFDA | ND (<0.000274) | ND (<0.000286) | ND (<0.000342) | ND (<0.000378) | ND (<0.000312) |
| PFDoA | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| PFHpS | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| PFHpA | ND (<0.000274) | ND (<0.000286) | ND (<0.000342) | ND (<0.000378) | ND (<0.000312) |
| PFHxS | ND (<0.000274) | ND (<0.000286) | ND (<0.000342) | ND (<0.000378) | ND (<0.000312) |
| PFHxA | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| PFNS | ND (<0.0011) | ND (<0.00114) | ND (<0.00137) | ND (<0.00151) | ND (<0.00125) |
| PFNA | **0.000289** | ND (<0.000286) | ND (<0.000342) | ND (<0.000378) | **0.000638** |
| FOSA | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000697) | ND (<0.000623) |
| PFOS | **0.000654** | ND (<0.000286) | **0.000663** | **0.000771** | **0.000969** |
| PFOA | **0.000381** | **0.000359** | **0.000588** | **0.000957** | **0.000652** |
| PFPeS | ND (<0.0011) | ND (<0.00114) | ND (<0.00137) | ND (<0.00151) | ND (<0.00125) |
| PFPeA | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| PFTA | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| PFTrDA | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| PFUnA | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| 11Cl-PF3OUdS | ND (<0.0011) | ND (<0.00114) | ND (<0.00137) | ND (<0.00151) | ND (<0.00125) |
| 3:2FTS | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| 4:2FTS | ND (<0.0011) | ND (<0.00114) | ND (<0.00137) | ND (<0.00151) | ND (<0.00125) |
| 6:2FTS | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| HFPO-DA | ND (<0.00274) | ND (<0.00286) | ND (<0.00342) | ND (<0.00378) | ND (<0.00312) |
| ADONA | ND (<0.0011) | ND (<0.00114) | ND (<0.00137) | ND (<0.00151) | ND (<0.00125) |
| 9Cl-PF3ONS | ND (<0.0011) | ND (<0.00114) | ND (<0.00137) | ND (<0.00151) | ND (<0.00125) |
| NEtFOSAA | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| NMeFOSAA | ND (<0.000548) | ND (<0.000572) | ND (<0.000684) | ND (<0.000755) | ND (<0.000623) |
| | **0.001324** | **0.000359** | **0.001251** | **0.001728** | **0.002259** |

111.    The best and current scientific understanding of PFAS Chemicals recognizes the above concentrations found in the soil at Plaintiffs' property as dangerous enough to require immediate remediation, as soil contamination at these levels is likely to cause groundwater and drinking water well contamination, leading to human exposure to dangerous levels of toxic PFAS Chemicals.

112.    PFAS contamination in soil adversely impacts water supplies. Because PFAS are mobile, they can be transported through rainwater run-off and enter surface water and/or seep

through the soil and migrate into groundwater, which leads to PFAS contamination of sources of drinking water.[19]

113.    Thus, it is highly probable that the contamination of the soil on Plaintiff DePaul's and Plaintiff Arlene Quaranta's real property caused each of their respective drinking water wells to also become contaminated with toxic levels of PFAS Chemicals.

114.    Because of PFAS Chemicals' persistence and solubility, the risk of further contamination is ongoing and will remain indefinitely absent remediation and/or filtration.

> B. *Laboratory Testing Confirms Plaintiff DePaul's, Plaintiff Arlene Quaranta's, and Plaintiff Meriwether's Drinking Water Wells are Contaminated with Dangerous Levels of PFAS Chemicals.*

115.    A November 2023 laboratory analysis of Plaintiff DePaul's drinking water well water showed PFAS Chemical concentrations recognized by the EPA and the scientific community as harmful to human health. The results of this testing are shown below:

| PFAS Chemical | Result |
|---|---|
| Perfluorobutanesfulfonic acid (PFBS) | 8.36 ng/L |
| Perfluorohexanoic acid (PFHxA) | 11.7 ng/L |
| Perfluoroheptanoic acid (PFHpA) | 3.54 ng/L |
| Perfluorohexanesulfonic acid (PFHxS) | 2.73 ng/L |
| Perfluorooctanoic acid (PFOA) | 12.4 ng/L |
| Perfluorooctane sulfonic acid (PFOS) | 10.4 ng/L |

---

[19] https://www.epa.gov/sciencematters/addressing-challenges-pfas-protecting-groundwater-and-treating-contaminated-sources

116.     Similarly, a November 2023 laboratory analysis of Plaintiff Arlene Quaranta's drinking water well showed elevated PFAS Chemical concentrations recognized by the EPA and the scientific community as harmful to human health.

117.     Finally, a subsequent laboratory analysis of Plaintiff DePaul's drinking water well conducted in late January 2024 (the sample was taken on January 24, 2024) showed even higher concentrations of several PFAS Chemicals, including PFOS, PFOA, and PFHxA:

| PFAS Chemical | Result |
|---|---|
| Perfluorobutanesfulfonic acid (PFBS) | 6.6 ng/L |
| Perfluorohexanoic acid (PFHxA) | 15 ng/L |
| Perfluoroheptanoic acid (PFHpA) | 5.4 ng/L |
| Perfluorohexanesulfonic acid (PFHxS) | 2.8 ng/L |
| Perfluorooctanoic acid (PFOA) | 15 ng/L |
| Perfluorooctane sulfonic acid (PFOS) | 14 ng/L |
| Perfluorobutanoic acid (PFBA) | 5.9 |
| Perfluoropentanoic acid (PFPeA) | 14 |

118.     The predominant winds and topography of the area mean that similar PFAS Chemical concentrations would likely be observed in the water found in drinking water wells located near Plaintiffs' drinking water wells.

119.     More recently, an April 2024 laboratory analysis of Plaintiff Meriwether's drinking water well revealed PFAS Chemical concentrations recognized by the EPA and the scientific community as harmful to human health, with the results of this testing shown below:

| PFAS Chemical | Result |
|---|---|
| Perfluorobutanesfulfonic acid (PFBS) | 2.34 ng/L |
| Perfluorohexanoic acid (PFHxA) | 9.83 ng/L |
| Perfluorooctanoic acid (PFOA) | 9.26 ng/L |
| Perfluorooctane sulfonic acid (PFOS) | 2.66 ng/L |

120.     Because of PFAS Chemicals' persistence and solubility, the risk of further contamination is ongoing and will remain indefinitely absent remediation and/or filtration of Plaintiffs' water supply.

C. *Laboratory Testing Confirms Additional New Milford Residents' Drinking Water Wells are Contaminated with Dangerous Levels of PFAS Chemicals.*

121.     Plaintiff Minah McBreairty currently resides, and along with Plaintiff Jeffrey McBreairty, has resided during the relevant time period, in a residential home located on Kent Road, directly across from the Kimberly-Clark Landfill. The drinking water well on this property was designated as Monitoring Well B by Kimberly-Clark, and is highlighted in Figure 3, above.

122.     A May 2024 laboratory analysis of Monitoring Well B on the real property where Plaintiffs Minah and Jeffrey McBreairty reside or resided, respectively, shows PFAS Chemical concentrations recognized by the EPA and the scientific community as harmful to human health. The results of this testing are shown below:

| PFAS Chemical | Result |
|---|---|
| Perfluorooctanoic acid (PFOA) | 4.83 ng/L |
| Perfluorooctane sulfonic acid (PFOS) | 8.74 ng/L |

123. Similarly, a June 2024 laboratory analysis of a residence located on Sherwood Drive, just north of the Kimberly-Clark New Milford Facility—and part of the Sunny Valley Tax District community well that serves over 500 people—showed PFAS Chemical concentrations recognized by the EPA and the scientific community as harmful to human health:

| PFAS Chemical | Result |
|---|---|
| Perfluorooctanoic acid (PFOA) | 1.88 ng/L |
| Perfluorooctane sulfonic acid (PFOS) | 6.10 ng/L |

124. Because of PFAS Chemicals' persistence and solubility, the risk of further contamination is ongoing and will remain indefinitely absent remediation and/or filtration of these water supplies.

## VII. KIMBERLY-CLARK KNEW ITS PFAS USE POSED A THREAT TO THE HEALTH OF NEW MILFORD, CONNECTICUT RESIDENTS.

125. Kimberly-Clark knew, or reasonably should have known, that PFAS Chemicals are toxic, harmful to human health, resist natural degradation, render air, soil, and drinking water unsafe and/or non-potable, and are capable of being removed from air and water supplies if proper steps are taken.

126. Kimberly-Clark produces a variety of paper products in connection with its large portfolio of brands, including Andrex, Cottonelle, Depend, Huggies, Kleenex, Poise, Scott, U by Kotex, and Wypall. Paper manufacturers, including Kimberly-Clark, have knowingly used PFAS

Chemicals in paper manufacturing processes for many decades as a coating to repel grease, oil, fats, water, and other substances from their paper products, preventing absorption of these substances into the paper products.

127.     Although scientific understanding of the adverse environmental and health effects of PFAS has grown with continued study, there has been a well-publicized awareness of the inherent risks of these "forever chemicals" since at least the early 2000s, with the discovery of PFOA and PFOS in laboratory studies of human blood.

128.     In 2009, the EPA published provisional health advisories for PFOA and PFOS based on evidence available at that time. One year later, in 2010, Kimberly-Clark ceased dumping paper mill sludge at the Kimberly-Clark Landfill.

129.     In apparent recognition of the inherent dangers of PFAS use, Kimberly-Clark has recently identified for phase-out its use of PFAS Chemicals generally, with PFOA and PFOS use "restricted" (defined to mean that such "chemicals can only be used if written consent is provided").[20]

130.     Despite this, however, Kimberly-Clark has caveated its restriction of PFAS with the following disclaimer: "We do not add the materials identified on our Restricted Substances List to our products, however, we cannot always eliminate unavoidable traces of compounds that can originate from a variety of sources such as the manufacturing process or simply from the environment."[21]

131.     As demonstrated by the presence of PFAS in and around the Kimberly-Clark Landfill and New Milford Facility, prior to determining that it would "phase-out" or "restrict" use

---

[20] *Kimberly-Clark Restricted Substances List*, effective date June 11, 2020, available at https://www.kimberly-clark.com/-/media/kimberly/pdf/ingredients/st-14665-kimberly-clark-restricted-substances-list_june-2020.pdf?la=e
[21] https://www.kimberly-clark.com/en-us/brands/not-in-our-products

of PFAS Chemicals in or around 2020, Kimberly-Clark used PFAS Chemicals in its manufacturing processes at the New Milford Facility and dumped PFAS-laden waste in the unlined Kimberly-Clark Landfill until 2010. Kimberly-Clark did so despite widespread awareness of the harms of PFAS since at least the early 2000s.

132.    Critically, Kimberly-Clark has taken no apparent steps to test the Kimberly-Clark Landfill or surrounding area for the presence of PFAS and remediate—including up to the filing of Plaintiffs' complaint—despite the fact that, Kimberly-Clark knew (or should have known) that PFAS persist in the environment for long (if not indefinite) periods of time and adversely affect the environment and human health.

## VIII.    KIMBERLY-CLARK INJURED PLAINTIFFS AND MEMBERS OF THE CLASS.

133.    Plaintiffs and members of the Class reside near Defendant's New Milford Facility and/or the Kimberly-Clark Landfill.

134.    Kimberly-Clark's conduct alleged herein has caused injury to Plaintiffs' and members of the Class's bodies, real property, and water supplies.

135.    Accordingly, Plaintiffs seek to recover damages (including but not limited to compensatory, punitive, and/or consequential damages) for the harm caused by Defendant Kimberly-Clark's wrongful conduct, as detailed herein.

### A.    Defendant's Conduct Substantially and Unreasonably Interfered with Plaintiffs' and Members of the Class's Ability to Enjoy Their Property.

136.    Plaintiffs Bethany DePaul, Arlene Quaranta, and Margaret Meriwether have suffered injury to their real property and drinking water wells, including but not limited to loss of enjoyment of the property and drinking water wells, and diminution in value.

137.    Defendant's manufacture, use, disposal, storage, and/or distribution of PFAS Chemicals has injured the Plaintiffs' and the Class Member's enjoyment and quality of life.

138.    Plaintiffs' and the members of the Class's use and enjoyment of their property has been substantially and unreasonably impaired by Defendant's conduct. Owners of properties where the water supply and soil have been contaminated, including Plaintiffs and the members of the Class, can no longer use their natural water sources for drinking, cooking, or other ordinary household uses.

139.    Because any detectible level of PFAS in Plaintiffs' groundwater sources, well water, or elsewhere on their property requires investigation, treatment, remediation, and continued monitoring, the detection and/or presence of PFAS has resulted, and will continue to result, in significant injury and damage to Plaintiffs.

140.    Moreover, Plaintiffs and the members of the Class have suffered diminution of the value of their homes and properties due to the contamination of their soil and drinking water wells with PFAS Chemicals.

> **B.    *Kimberly-Clark's Conduct Caused Plaintiffs and Members of the Class to Suffer Subclinical Cellular Injuries That Have Created Present Injury to their Bodies, Tissue, and Cells and Have Substantially Increased Plaintiffs' and Members of the Class's Risk of Developing Cancers and Other Diseases Linked to PFAS Chemical Exposure.***

141.    Kimberly-Clark's conduct alleged herein caused Plaintiffs and members of the Class to be exposed to PFAS Chemicals, which, as detailed herein, are linked to cancers and several other conditions and diseases.

142.    For example, Kimberly-Clark's conduct caused Plaintiffs and the members of the Class to unknowingly ingest and absorb PFAS Chemicals including by, but not limited to, ingesting PFAS-contaminated drinking water originating from PFAS-contaminated drinking water wells

located on their own properties and others located in New Milford, Connecticut, ingesting food cooked with this water, and ingesting food grown in soil contaminated with PFAS Chemicals.

143.    Plaintiffs' and members of the Class's exposure to PFAS Chemicals caused by Kimberly-Clark caused Plaintiffs and members of the Class to suffer injuries, including, but not limited to subclinical cellular injuries that have substantially increased their risk of developing cancers and other diseases and conditions linked to PFAS Chemical exposure.

144.    Early detection of these cancers, diseases, and conditions, combined with prompt and effective treatment, will significantly decrease the risk of death and the severity of diseases, illnesses, and injuries suffered by Plaintiffs and members of the Class.

145.    For example, PFAS Chemical exposure causes PFAS Chemicals to bioaccumulate over time in Plaintiffs' and Members of the Class's bodies. The presence of manmade foreign substances, PFAS, in their bodies, tissue, and cells represents a manifest change in the bodies, tissue, and cells of Plaintiffs and members of the Class.

146.    As a result of Plaintiffs' and members of the Class's PFAS Chemical exposure described herein, caused by Kimberly-Clark, Plaintiffs and members of the Class have suffered present injury, *i.e.,* subclinical cellular changes to their bodies, tissue, and cells.

147.    Subclinical cellular changes from PFAS Chemical exposure also leaves Plaintiffs and members of the Class at an increased risk of developing cancers and other serious diseases, conditions illnesses, and injuries. Plaintiffs and members of the Class therefore face significant future healthcare costs to ensure that any physical and/or clinical manifestation resulting from the PFAS Chemical exposure can be caught early and treated.

148.    Accordingly, as a result of Plaintiffs' and members of the Class's PFAS Chemical exposure described herein, caused by Kimberly-Clark, the subclinical cellular injuries Plaintiffs

and members of the Class have experienced have substantially increased their risk of developing

cancers and other diseases known to be caused by PFAS Chemicals.

## CLASS ALLEGATIONS

149.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a), 23(b)(2) and (3), and 23(c)(4).

150.   Plaintiffs seek class certification of the classes defined as follows (the "Class"):

**Property Damage Class**: All citizens of Connecticut who are or were owners of real property located in New Milford, Connecticut or surrounding towns whose land and/or water supply have been contaminated with detectable levels of PFAS Chemicals (as defined above) as a result of Kimberly-Clark's improper use and/or disposal of PFAS Chemicals during the Class Period (the "Property Damage Class").

**Medical Monitoring Class:** All natural persons who resided at a home in New Milford, Connecticut or surrounding towns who ingested PFAS-contaminated water such that PFAS accumulated in their body and tissue, or any natural child born to a resident who meets and/or met these criteria at the time of the child's birth during the Class Period (the "Medical Monitoring Class").

151.   Plaintiffs reserve the right to modify or refine the definitions of the Class and add

subclasses based upon discovery of new information.

152.   Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the

Action and members of their staff, as well as members of their families; (b) Defendant Kimberly-

Clark and Defendant Kimberly-Clark's predecessors, parents, successors, heirs, assigns,

subsidiaries, and any entity in which Defendant Kimberly-Clark or its parents have a controlling

interest, as well as Defendant Kimberly-Clark's current or former employees, agents, officers, and

directors; (c) persons who properly execute and file a timely request for exclusion from the Class;

(d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise

released; (e) counsel for Plaintiffs and Defendant Kimberly-Clark; and (f) the legal representatives,

successors, and assigns of any such excluded persons.

153.   <u>Ascertainability</u>. The proposed Class is readily ascertainable because it is defined using objective criteria which allow class members to determine if they are a member of the Class. Further, the Class can be readily identified through public records and/or records maintained by Defendant Kimberly-Clark.

154.   <u>Numerosity</u>. The Class is so numerous that joinder of individual members herein is impracticable. There are thousands of individuals and/or entities that reside in the area surrounding Defendant Kimberly-Clark's New Milford Facility who have been damaged by Defendant Kimberly-Clark's conduct.

155.   <u>Commonality</u>. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including:

   a.   Whether Defendant's conduct was negligent;

   b.   Whether Defendant's conduct constitutes a public nuisance;

   c.   Whether Defendant's conduct constitutes an abnormally dangerous activity;

   d.   Whether Defendant's conduct was willful, wanton, reckless, intentional, malicious, and/or outrageous conduct in utter indifference to and/or conscious disregard for the health, safety, and well-being of others;

   e.   Whether Defendant owed a duty of care to the members of the Class;

   f.   Whether the duty of care owed to the members of the Class included the duty to protect against exposures to unsafe and unnecessarily high levels of PFAS;

   g.   Whether Defendant breached its duty to warn the members of the Class of, and protect the members of the Class from, the long-term health risks and consequences of exposure to high levels of PFAS;

h.  Whether the PFAS contamination described herein substantially interfered with the Plaintiffs' and the Members of the Class's use and enjoyment of their property;

i.  Whether the PFAS contamination described herein caused, and continues to cause, a continuous invasion of the property rights of the Plaintiffs and the members of the Class;

j.  Whether Defendant caused the devaluation of the Plaintiffs and the members of the Class's properties; and

k.  Whether medical monitoring and early detection will provide benefits to the members of the Class.

156.  <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the other members of the proposed Class. Plaintiffs and members of the Class suffered injuries as a result of Defendant Kimberly-Clark's wrongful conduct that is uniform across the Class.

157.  <u>Adequacy</u>. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Class, and Defendant Kimberly-Clark has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting the Action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class.

158.  <u>Substantial Benefits</u>. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The prosecution of separate

actions by individual members of the Class would impose heavy burdens upon the Courts and Defendant Kimberly-Clark, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

159.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

160.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief, if any, that may be awarded by the Court is appropriate as to the Class as a whole.

161.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

## CLAIM 1

### NEGLIGENCE

162.    Plaintiffs and the members of the Class re-allege and incorporate the allegations set forth above.

163.    Defendant Kimberly-Clark owed Plaintiffs and the members of the Class a duty of reasonable care to avoid using, storing, emitting, discharging, disposing, and/or distributing PFAS Chemicals at or near the New Milford Facility in a manner that would cause Plaintiffs and the members of the Class injury or harm.

164.    Plaintiffs and the members of the Class were located within the scope of the risk created by Defendant Kimberly-Clark's conduct and were foreseeable victims of any negligent operations by Defendant Kimberly-Clark at or nearby the New Milford Facility, including the use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS Chemicals.

165.    Defendant Kimberly-Clark owed Plaintiffs and the members of the Class a duty of reasonable care to eliminate or minimize the discharge of PFAS Chemicals into the air, land, and water, commensurate with the risk of using, emitting, discharging, disposing, and/or distributing PFAS.

166.    Given the likelihood that Defendant Kimberly-Clark was creating PFAS contamination of air, land, and water that would result in exposure to residents near the New Milford Facility, increasing the risk that those residents would develop significant illnesses, diseases, and injuries, Defendant Kimberly-Clark also had a duty to use reasonable care to avoid, minimize, or warn about their use, storage, emission, discharge, disposal, and/or distribution of PFAS.

167.    Defendant Kimberly-Clark breached its duty to use reasonable care in one or more of the following ways:

      a.   By negligently failing to employ safe methods of operation to adequately prevent, control, or eliminate PFAS discharge into the environment via air, soil, and/or water;

      b.   By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS into the environment;

      c.   By negligently failing to promptly and effectively respond to its release of PFAS into the environment;

      d.   By negligently failing to warn Plaintiffs and the members of the Class of the PFAS they were using, storing, emitting, discharging, disposing, selling, and/or distributing;

      e.   By negligently failing to locate its operations in an unpopulated or much less populated area and/or by negligently discharging dangerous amounts of PFAS into land and groundwater near a populated community; and

      f.   By negligently failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS and of the consequent risks of illness, disease, and injury that the residents acquired because of that exposure.

168.    As a direct and proximate result of Defendant Kimberly-Clark's negligence, Plaintiffs and the members of the Class have suffered, presently suffer, and will continue to suffer real property damage, out of pocket expenses, personal property damage, loss of use and

enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

169.    Defendant Kimberly-Clark is liable to Plaintiffs and the members of the Class for fair compensation for the resulting injuries, which includes: reasonable expenses incurred for medical care and nursing in the treatment and cure of the injuries, diminution in earning capacity, and pain and suffering, as are shown to be reasonably probable to continue in the future.

## CLAIM 2

### MEDICAL MONITORING

170.    Plaintiffs and the members of the Class re-allege and incorporate here the allegations set forth above.

171.    As a direct and proximate result of Defendant Kimberly-Clark's conduct, including the improper use, storage, emission, discharge, disposal, sale and/or distribution of PFAS Chemicals described herein, Plaintiffs and members of the Class have been exposed to hazardous PFAS Chemicals through contamination of air, land, and water.

172.    Plaintiffs' and members of the Class's exposure to PFAS Chemicals described herein has injured Plaintiffs by producing subclinical cellular changes in their bodies, tissue, and cells. That subclinical cellular change substantially increases the risk of Plaintiffs and members of the Class developing cancers and other serious diseases, illnesses, and injuries linked to PFAS Chemical exposure.

173.    For example, as a result of the detectable, dangerous levels of PFAS Chemicals in Plaintiffs' water and land, Plaintiffs have ingested and absorbed PFAS Chemicals, which are known to bioaccumulate and have bioaccumulated over time. The presence of PFAS Chemicals in Plaintiffs' and members of the Class's bodies, tissue, and cells represents a manifest change in Plaintiffs' and members of the Class's bodies, tissue, and cells and leaves them at an increased risk

of serious disease, illness, or injury. This bioaccumulation is a physiological change in Plaintiffs' and members of the Class's bodies occurring at a subcellular level.

174. Due to these subclinical cellular changes, Plaintiffs and the members of the Class are at an increased risk of developing cancers and other illnesses, diseases, and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

175. Effective medical testing for reliably early detection of cancers and other diseases and conditions related to PFAS Chemical exposure exists.

176. Early detection, combined with prompt and effective treatment, will significantly decrease the risk of death and the severity of diseases, illnesses, and injuries for Plaintiffs and members of the Class.

177. Such testing is not routinely performed in the absence of known exposure to PFAS Chemicals but is reasonable, periodically necessary, and conforms with the standard of medical and scientific care when such exposures are known.

178. Diagnostic testing of Plaintiffs and the members of the Class for early detection of cancers and other illnesses, diseases, and disease processes caused by exposure to PFAS Chemicals is thus reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

179. A medical monitoring program will allow for early detection and prompt and effective treatment of any serious disease, illness, or injury caused by the subclinical cellular changes Plaintiffs and members of the Class have experienced as a result of PFAS exposure. A medical monitoring program will save lives, decrease the severity of illness, decrease the impact

of illness on lives and families, and reduce the costs of caring for such illnesses, and are periodically necessary.

180.    The present value of the reasonable cost of such tests now and into the future can be calculated and known with reasonable certainty after further discovery is made.

181.    In the event that a standalone claim for medical monitoring cannot be maintained, Plaintiffs request in the alternative that medical monitoring be awarded as a form of relief in connection with their remaining claims.

## CLAIM 3

## PRIVATE NUISANCE

182.    Plaintiffs and the members of the Class re-allege and incorporate here the allegations set forth above.

183.    At all relevant times, Defendant Kimberly-Clark knew or should have known PFAS Chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of Kimberly-Clark's use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS at or near the New Milford Facility would cause injuries and property damage to Plaintiffs and the members of the Class.

184.    Defendant Kimberly-Clark, through the negligent, reckless, and/or intentional conduct alleged in this Complaint, has contaminated real property owned and/or possessed by Plaintiffs and the members of the Class.

185.    Defendant Kimberly-Clark created, permitted, and maintained a hazardous condition or activity on or near the New Milford Facility that caused substantial and unreasonable interference with Plaintiffs' and the members of the Class's use and enjoyment of their property. Defendant Kimberly-Clark's interference has caused and is causing Plaintiffs and the members of the Class to, among other things, refrain from using their land to cultivate and grow fruit,

vegetables, and other food and to refrain from using their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

186.   Defendant Kimberly-Clark's contamination with PFAS of real property owned and/or possessed by Plaintiffs and the members of the Class also has substantially interfered otherwise with the Plaintiffs' and members of the Class's ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

187.   Defendant Kimberly-Clark's conduct was intentional, negligent, reckless, and ultrahazardous, and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the members of the Class.

188.   As a direct and proximate result of Defendant Kimberly-Clark's use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS and the exposure of the persons and/or property of Plaintiffs and the members of the Class to PFAS resulting from the conduct of Defendant, Plaintiffs and the members of the Class presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

189.   Plaintiffs and the members of the Class are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

## CLAIM 4

### PUBLIC NUISANCE

190.    Plaintiffs and the members of the Class re-allege and incorporate here the allegations set forth above.

191.    At all times relevant, Defendant Kimberly-Clark knew or should have known PFAS to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS would cause injuries and losses to the persons and property of Plaintiffs and the members of the Class.

192.    Plaintiffs, the members of the Class, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS Chemicals.

193.    Defendant Kimberly-Clark's conduct in using, disposing, storing, and/or treating PFAS-contaminated materials contaminated the air and groundwater of Plaintiffs, the Class members, and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs and the members of the Class to enjoy their real property.

194.    Defendant Kimberly-Clark knew or should have known that the materials containing PFAS it used, stored, emitted, discharged, disposed, sold, and/or distributed would have a deleterious effect upon the health, safety, and well-being of people living in New Milford, Connecticut, and the surrounding areas, including Plaintiffs and the members of the Class.

195.    Defendant Kimberly-Clark's use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS at or near the New Milford Facility caused those who owned and/or lived on nearby properties, including Plaintiffs and the members of the Class, to come into contact with high levels of PFAS on a routine and constant basis, causing substantially

elevated health risks resulting from exposure to dangerous levels of PFAS, as well as property damage and diminished property values.

196.     As a direct and proximate result of Defendant Kimberly-Clark's use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS in New Milford, Connecticut and the surrounding area:

    a.   Plaintiffs' and the members of the Class's common right to live free of dangerous, toxic substances was eliminated and/or severely diminished;

    b.   Plaintiffs and the members of the Class were exposed to harmfully elevated levels of PFAS Chemicals;

    c.   PFAS Chemicals contaminated the air, land, and water owned, possessed, and/or used by Plaintiffs and the members of the Class, thereby exposing their bodies to PFAS;

    d.   Plaintiffs and the members of the Class will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources; and

    e.   Plaintiffs and the members of the Class presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

197.     As a result of the foregoing, Plaintiffs and the members of the Class have suffered a special injury different in kind from the general public.

## CLAIM 5

## RECKLESSNESS OR WILLFUL AND WANTON CONDUCT

198.    Plaintiffs and the members of the Class re-allege and incorporate here the allegations set forth above.

199.    At all times relevant, Defendant Kimberly-Clark owed a duty to refrain from willful, wanton, reckless, intentional, malicious, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard for the health, safety, and well-being of Plaintiffs and the members of the Class.

200.    On information and belief, at all times relevant, Defendant Kimberly-Clark was aware of the considerable health risks associated with the discharge of PFAS into air, land, and water, including without limitation the risk of causing various forms of cancer, to those exposed to PFAS from air, land, and water. Similarly, Defendant Kimberly-Clark knew that use, emission, discharge, disposal, and/or distribution of materials containing PFAS, or likely containing PFAS, would result in the emission of unreasonably dangerous levels of PFAS contaminating the air, land, and groundwater in a manner that would be likely to cause significant financial injury, personal injury, and bodily harm to Plaintiffs and the members of the Class.

201.    Notwithstanding this knowledge, Defendant Kimberly-Clark acted in a manner that was an extreme departure from ordinary care in a situation where a high degree of danger to Plaintiffs and members of the Class was readily apparent due to the harmful nature of PFAS.

202.    Defendant Kimberly-Clark acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the members of the Class by, among other things:

    a.  Failing to take reasonable steps to prevent or minimize the accumulation and
        emission of PFAS Chemicals used in its manufacturing processes at the New

54

Milford Facility, when it knew doing so was necessary to prevent significant personal injury and bodily harm, as well as financial injury, to Plaintiffs and the members of the Class;

b.   Disposing of PFAS-contaminated waste at or near the New Milford Facility in such a way that was likely to cause contamination to nearby properties, when it knew doing so was likely to cause significant personal injury and bodily harm, as well as financial injury, to Plaintiffs and the members of the Class;

c.   Failing to employ safe methods of operation at the New Milford Facility to adequately prevent, control, or eliminate PFAS discharge into the environment, when it knew doing so was necessary to prevent significant personal injury and bodily harm, as well as financial injury, to Plaintiffs and the members of the Class;

d.   Failing to institute proper procedures and training at the New Milford Facility to prevent, minimize, and/or promptly and effectively respond to its release of PFAS into the environment, when it knew doing so was necessary to prevent significant personal injury and bodily harm, as well as financial injury, to Plaintiffs and the members of the Class; and

e.   Failing to promptly and effectively respond to its release of PFAS at or near the New Milford Facility into the environment, when it knew doing so was necessary to prevent significant personal injury and bodily harm, as well as financial injury, to Plaintiffs and the members of the Class.

203.   As a direct and proximate result of Defendant Kimberly-Clark's willful, wanton, and reckless conduct, Plaintiffs and the members of the Class have suffered, presently suffer, and

will continue to suffer bodily harm and personal injury as well as real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

## CLAIM 6

## STRICT LIABILITY FOR ULTRAHAZARDOUS OR ABNORMALLY DANAGEROUS ACTIVITY

204.    Plaintiffs and the members of the Class re-allege and incorporate here the allegations set forth above.

205.    Due to the nature of PFAS, its persistence in the environment, and its harmful effects on human health, Defendant Kimberly-Clark's use, emission, discharge, disposal, and/or distribution of PFAS constitutes an intrinsically dangerous, ultrahazardous, or abnormally dangerous activity.

206.    Defendant Kimberly-Clark's use, emission, discharge, disposal, and/or distribution of PFAS caused contamination of air, land, and water, which poses a high degree of risk of injury and loss to Plaintiffs and the members of the Class.

207.    The presence of PFAS contaminants in the environment and the human body poses an inherent and extraordinary threat to human health and well-being and a danger of lasting contamination of property and water.

208.    The contamination of the property, water, and bodies of Plaintiffs and the members of the Class were all probable and foreseeable consequences that resulted from Defendant Kimberly-Clark's decades-long use, emission, discharge, disposal, and/or distribution of materials containing PFAS at and around the New Milford Facility.

209.     There is a reasonable likelihood that Defendant Kimberly-Clark's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at the New Milford Facility near the populated and residential areas of New Milford, Connecticut, and the surrounding area will result in life-threatening cancers and other illnesses, diseases, disease processes, and injuries for Plaintiffs and the members of the Class.

210.     Defendant Kimberly-Clark's decision to engage in the use, emission, discharge, disposal, and/or distribution of materials containing PFAS at or near the New Milford Facility, thereby causing large amounts of PFAS to be dispersed into the surrounding community, was unreasonably dangerous.

211.     Defendant Kimberly-Clark's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at or near the New Milford Facility created a high risk of harm to those who live in the area, including Plaintiffs and the members of the Class, and substantially increased the risk of community residents, including Plaintiffs and the members of the Class, developing cancers and other illnesses, diseases, disease processes, and injuries.

212.     The activities conducted by Defendant Kimberly-Clark have been and are exceedingly dangerous, while offering little or no value to the surrounding community.

213.     Because the activities engaged in by Defendant Kimberly-Clark as outlined in this Complaint are ultrahazardous or abnormally dangerous, Defendant Kimberly-Clark is strictly liable for any injuries proximately resulting from those activities.

214.     As a direct and proximate result of Defendant Kimberly-Clark's abnormally dangerous or ultrahazardous activities and the exposure of Plaintiffs and the members of the Class to PFAS Chemicals resulting from those activities, Plaintiffs and the members of the Class presently suffer, and will continue to suffer, bodily harm, real property damage, out of pocket

expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

## CLAIM 7

### VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. § 42-110a, *et seq.*

215.    Plaintiffs and the members of the Class re-allege and incorporate here the allegations set forth above.

216.    The Connecticut Unfair Trade Practices Act (CUTPA), CONN. GEN. STAT. § 42-110b(a) declares that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

217.    Defendant Kimberly-Clark was a "person" within the meaning of CONN. GEN. STAT. § 42-110a(1) that engaged in "trade" and/or "commerce" as defined by CONN. GEN. STAT. § 42-110a(4) within the state of Connecticut.

218.    CONN. GEN. STAT. § 42-110g(b) authorizes any person suffering ascertainable loss of money or property, real or personal, as a result of a CUPTA violation to bring a class action.

219.    Plaintiffs are "persons" within the meaning of CONN. GEN. STAT. § 42-110a(1).

220.    Defendant Kimberly-Clark's deceptive and/or unfair conduct in the conduct of trade and/or commerce within Connecticut caused Plaintiffs and members of the Class to suffer ascertainable harm through the contamination of their air, land, and water supply.

221.    Defendant Kimberly-Clark's deceptive conduct was likely to, and did in fact, deceive and mislead members of the public as to the quality of the air, soil, and water they were using and/or consuming, including Plaintiffs and members of the Class acting reasonably under the circumstances, to their detriment.

222.    Defendant Kimberly-Clark also engaged in unfair conduct pursuant to CUTPA in that its conduct (1) has caused or is likely to cause substantial bodily harm and personal injury to Plaintiffs and members of the Class; (2) the injuries caused by Defendant Kimberly-Clark could not have been reasonably avoided by Plaintiffs and members of the Class, and (3) the injuries caused by Defendant Kimberly-Clark to Plaintiffs and members of the Class is not outweighed by any countervailing benefits to Plaintiffs and members of the Class.

223.    Defendant Kimberly-Clark's unfair conduct thus caused Plaintiffs and members of the Class to suffer ascertainable harm.

224.    Defendant Kimberly-Clark chose to engage in conduct that failed to properly filter PFAS and/or prevent PFAS contamination, despite the availability of PFAS filtration options. This unfair conduct caused substantial injury to Plaintiffs and members of the Class in that it exposed them to dangerous, hazardous levels of PFAS Chemicals. These injuries could not have been reasonably avoided by Plaintiffs and members of the Class as they lacked adequate knowledge regarding the contamination and had no other options for publicly provided drinking water.

225.    Because Defendant Kimberly-Clark knew or should have known that its conduct was deceptive and/or unfair under CONN. GEN. STAT. § 42-110b(a), its conduct was willful and/or was undertaken with reckless disregard for the harm it would cause Plaintiffs and members of the Class.

226.    Defendant Kimberly-Clark's deceptive and unfair acts described above directly and proximately caused Plaintiffs and members of the Class to suffer actual damages, attorneys' fees, and costs.

227.    Defendant Kimberly-Clark's deceptive and unfair conduct is continuing, with no indication that it intends to cease its course of conduct, posing a threat of future harm to Plaintiffs

and members of the Class, such that prospective injunctive relief in the form of installation of filters and medical monitoring is necessary.

228.    Accordingly, Plaintiffs, individually and on behalf of all others similarly situated, seek (a) a declaration that Defendant Kimberly-Clark's conduct described above violates the Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a, *et seq.;* (b) an award of actual damages; (c) an award of attorneys' fees and costs pursuant to CONN. GEN. STAT. § 42-110g(d); (d) an order enjoining Defendant Kimberly-Clark from continuing to engage in the unfair and deceptive acts and practices described above; and (e) any further relief the Court deems just and proper.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the members of the Class, claim monetary damages in excess of $5,000,000 and equitable relief, including:

1. Damages for Plaintiffs' financial losses;

2. Attorneys' fees and costs;

3. Statutory punitive damages pursuant to CONN. GEN. STAT. § 42-110g(a);

4. Attorneys' fees and costs pursuant to CONN. GEN. STAT. § 42-110g(d);

5. Equitable relief in the form of an equitable order directing Defendant Kimberly-Clark to correct its practices and to install systems capable of and designed to filter PFAS Chemicals down to non-detectable levels and requiring Defendant Kimberly-Clark to establish a diagnostic medical testing program and medical monitoring protocol for Plaintiffs and the Class to monitor individuals' health and diagnose at an early stage any ailments that can result from exposure to PFAS Chemicals; and

6.   Such other relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

DATED:          June 21, 2024                    Respectfully submitted,

SILVER GOLUB & TEITELL LLP

*/s/ Ian W. Sloss*
Ian W. Sloss (ct31244)
Johnathan Seredynski (ct30412)
Krystyna Gancoss (ct31660)
Kate Sayed (ct31667)
SILVER GOLUB & TEITELL LLP
ONE LANDMARK SQUARE, FLOOR 15
STAMFORD, CONNECTICUT 06901
Tel. (203) 325-4491
isloss@sgtlaw.com
jseredynski@sgtlaw.com
kgancoss@sgtlaw.com
ksayed@sgtlaw.com

*Counsel for Plaintiffs*