**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BETHANY DePAUL, ARLENE QUARANTA, MEREDITH QUARANTA, MARGARET MERIWETHER, MINAH McBREAIRTY, and JEFFREY McBREAIRTY, *individually and on behalf of all others similarly situated*, Plaintiffs, | ) ) ) ) ) ) ) ) | CASE NO. 3:24-CV-271 (KAD) |
| v. | ) ) ) | MARCH 27, 2026 |
| KIMBERLY-CLARK CORPORATION, *Defendant.* | ) ) | |

**MEMORANDUM OF DECISION**
**RE: DEFENDANT'S MOTION TO DISMISS (ECF NO. 35)**

Kari A. Dooley, United States District Judge:

Through this putative class action, Plaintiffs Bethany DePaul, Arlene Quaranta, Meredith Quaranta, Margaret Meriwether, Minah McBreairty, and Jeffrey McBreairty ("Plaintiffs") bring claims against Defendant Kimberly-Clark Corporation ("Kimberly-Clark" or "Defendant"), arising out of its alleged use, discharge, distribution, and/or disposal of per- and polyfluoroalkyl substances and their constituents (hereinafter, "PFAS Chemicals" or "PFAS") in its manufacturing processes in and around New Milford, Connecticut, resulting in injuries to Plaintiffs' and other class members' bodies and property. *See* Third Amended Complaint ("TAC"), ECF No. 41. On August 6, 2024, Kimberly-Clark filed the instant, fully dispositive Motion to Dismiss. ECF No. 35. For the reasons that follow, Defendant Kimberly-Clark's Motion to Dismiss is **GRANTED**.

**Allegations**

The Court assumes the parties' familiarity with the allegations and circumstances underlying this case and recites herein only those relevant to the adjudication of the instant Motion to Dismiss.[1]

Kimberly-Clark is a Delaware corporation, with its principal place of business in Irving, Texas. *See* TAC at ¶ 10. For over 50 years, Kimberly-Clark has maintained a paper mill situated on a 60-acre parcel bordering the Housatonic River in New Milford, Connecticut (the "New Milford Facility"), and has historically manufactured a variety of products there for popular brand names like Kleenex, Scott, and Huggies. *See id.* at ¶¶ 39, 40, 42. Currently, the New Milford Facility exclusively manufactures tissue paper. *See id.* at ¶ 42.

Broadly, Plaintiffs allege that Kimberly-Clark is responsible for elevated levels of PFAS Chemicals[2] throughout New Milford. In particular, Plaintiffs' claims appear to be based on the purportedly elevated levels of two specific PFAS Chemicals, Perfluorooctanoic Acid ("PFOA") and Perfluorooctane Sulfonate ("PFOS"). In support of their claims, Plaintiffs posit two sources of contamination: (1) "PFAS-laden" "short fiber paper sludge waste" generated at the New Milford Facility and dumped at its nearby landfill; and (2) PFAS Chemicals that escaped from the New Milford Facility through smokestack emissions. Plaintiffs also allege "continuous pollution cycles" whereby water from the Housatonic River, having been contaminated through the

---

[1] Though not recited herein, the Court accepts as true Plaintiffs' allegations regarding PFAS Chemicals generally, and the adverse human health consequences that can occur from exposure to PFAS Chemicals. *See* TAC at ¶¶ 26–37.

[2] The Court acknowledges that some of the testing conducted by Plaintiffs reflects levels of additional PFAS Chemicals in the soil, drinking water, and/or surface water around New Milford. *See* TAC at ¶¶ 117, 119, 121. But the only specific PFAS Chemicals arguably alleged to be used by Kimberly-Clark in its manufacturing processes are PFOS and PFOA. As such, it is unclear to what extent Plaintiffs are asserting that the levels of any other PFAS Chemicals (*e.g.*, PFHxA) have caused their injuries. In light of this uncertainty, the Court has construed the TAC as only asserting that Plaintiffs' injuries were caused by Kimberly-Clark's use of PFOS and PFOA.

foregoing release of PFAS Chemicals, is subsequently drawn back into the New Milford Facility for use in Kimberly-Clark's manufacturing processes.

Short Fiber Paper Sludge and The Kimberly-Clark Landfill

Kimberly-Clark also owns a 165-acre landfill site (the "Kimberly-Clark Landfill"), which is located a short distance up the road from the New Milford Facility. *Id.* at ¶ 48. From 1969 to 2010, Kimberly-Clark operated an "active short fiber paper sludge disposal operation" at the Kimberly-Clark Landfill, after which time the Landfill was "capped with 24 inches of fill and closed in 2017." *See id.* at ¶¶ 49, 52. "Short fiber paper sludge" is a byproduct of the paper manufacturing process that is "notorious" for containing high concentrations of PFAS Chemicals. TAC at ¶ 48. Until 2010, Kimberly-Clark used types of PFAS Chemicals, including PFOS and PFOA, in its manufacturing processes at the New Milford Facility and dumped "PFAS-laden" short fiber paper sludge at the Kimberly-Clark Landfill, before determining in or around 2020 that it would phase-out such processes. *Id.* at ¶¶ 63, 133. Kimberly-Clark did so notwithstanding that it knew, or reasonably should have known, the harms caused by such PFAS Chemicals.[3] *Id.* at ¶¶ 127–28.

As a result of the short fiber paper sludge dumped therein, the Kimberly-Clark Landfill is leaching dangerous levels of PFAS Chemicals into the nearby water table and surrounding drinking water wells, as well as the Housatonic River (hereinafter, the "Landfill Theory"). *See id.* at ¶¶ 48, 57. From there, and insofar as Kimberly-Clark uses water drawn from the Housatonic River in its manufacturing processes, and such water was already contaminated through the sludge

---

[3] Landfill Permits issued to Kimberly-Clark by the Connecticut Department of Energy and Environmental Protection ("DEEP") permitted the disposal of short fiber paper mill sludge originating from the New Milford Facility, and therefore, all contents of the Kimberly-Clark Landfill originated from the New Milford Facility. *Id.* at ¶ 51. Moreover, the entire time Kimberly-Clark operated the Landfill, it was permitted and monitored by DEEP, and monitored any groundwater on the property and nearby residences. *Id.* at ¶¶ 51, 53–54.

dumped at the Kimberly-Clark Landfill and subsequently leached into nearby surface and/or groundwater that flows into the Housatonic River, Plaintiffs allege that Kimberly-Clark has created a "continuous pollution cycle," as illustrated below:



*See id.* at ¶ 61 (Figure 6).

Notwithstanding the foregoing, Kimberly-Clark has taken no apparent steps to test the Kimberly-Clark Landfill or surrounding area for the presence of PFAS Chemicals, or remediate exposure. *Id.* at ¶ 134.

<u>Smokestack Emissions</u>

Plaintiffs additionally theorize that a "secondary cycle of pollution" was formed through Kimberly-Clark's release of PFAS Chemicals into the air via emissions from the New Milford Facility's smokestacks (hereinafter, the "Emissions Theory"). *See id.* at ¶ 70. Specifically, insofar as Kimberly-Clark used PFAS Chemicals (and continues to use PFAS-contaminated water, *see supra* at 3) in its manufacturing processes, the Facility's incinerators and smokestacks create(d) and release(d) contaminated gases and solids into the atmosphere. *See id.* Such "stack emissions" resulted from insufficient filtering of "PFAS-laden" dust, which was then exhausted into the atmosphere. *Id.* at ¶ 88. The "PFAS-laden" stack emissions caused widespread contamination

4

across the New Milford region, having traveled great distances away from the New Milford Facility, and spread to land and water supplies that otherwise might be unaffected by groundwater contamination, as illustrated below:



PFAS contaminated water from the Housatonic River is used by Kimberly-Clark at the New Milford Facility

Airborne PFAS-contaminated stack emissions travel to surrounding elevated terrain, contaminating soil

PFAS leaches from real property into surrounding area's water table and drinking water wells

*See id.* at ¶ 70 (Figure 7).

Due to Kimberly-Clark's active pollution of the Housatonic River, the "above contamination cycle[s] will continue as long as the New Milford Facility draws water from the contaminated Housatonic River." *Id.* at ¶ 71.

<u>Testing</u>

In support of its claims, Plaintiffs conducted extensive testing of the soil, surface water, and drinking water around New Milford, to include locations near the New Milford Facility and the Kimberly-Clark Landfill. Plaintiffs allege that the laboratory analysis of soil and drinking water wells in New Milford, including on Plaintiffs' properties, has confirmed the presence of PFAS Chemicals at dangerous levels harmful to human health. *See id.* at ¶¶ 109-126.

According to Plaintiffs, testing conducted in 2024 of the groundwater and/or surface water from the area surrounding the Kimberly-Clark Landfill, its drainage stream, and a nearby private drinking water well ("Monitoring Well B") demonstrated that the short fiber paper mill sludge

dumped in the Kimberly-Clark Landfill contained PFOS and PFOA. *Id.* at ¶¶ 73, 75, 78. Specifically, PFOS and PFOA were present in water flowing from the Kimberly-Clark Landfill drainage stream immediately after it leaves the Landfill, at levels of 31.2 ng/L and 9.33 ng/L, respectively.[4] *Id.* at ¶ 79. PFOS and PFOA were also present in water flowing from the Kimberly-Clark Landfill drainage culvert into the Housatonic River, at levels of 17.3 ng/L and 5.91 ng/L , respectively. *Id.* at ¶ 77. Likewise, PFOS and PFOA were present in Monitoring Well B, located across the street from the Kimberly-Clark Landfill and on Plaintiffs Minah and Jeffrey McBreairty's property, at levels of 8.74 ng/L and 4.83 ng/L respectively. *Id.* at ¶ 124.

Plaintiffs conducted additional testing of the drinking water wells located on several Plaintiffs' properties. In November 2023, PFOS and PFOA were present in Plaintiff DePaul's drinking water at levels of 10.4 ng/L and 12.4 ng/L, respectively. *Id.* at ¶ 117. In January 2024, PFOS and PFOA were present in Plaintiff DePaul's drinking water at even higher levels of 14 ng/L and 15 ng/L, respectively. *Id.* at ¶ 119. Though the precise sampling figures are not set forth in the TAC, elevated levels of PFAS Chemicals were also present in Plaintiff Quaranta's drinking water well. *See id.* at ¶ 118. In April 2024, PFOS and PFOA were present in Plaintiff Meriweather's drinking water at levels of 2.66 ng/L and 9.26 ng/L, respectively. *Id.* at ¶ 121.

Further soil testing from Plaintiff DePaul and Plaintiff Quaranta's properties, as well as three public parks near the New Milford Facility, revealed dangerous levels of PFAS Chemicals. *See id.* at ¶¶ 109–113.

Injuries

Kimberly-Clark's manufacture, use, disposal, storage, and/or distribution of PFAS Chemicals has injured Plaintiffs' and class members' enjoyment and quality of life, including loss

---

[4] 1 ng/L is directly equivalent to 1 part per trillion (ppt).

of enjoyment of their properties and drinking water wells, and diminution in value of same.  *See id.* at ¶¶ 138–142.  Plaintiffs and other members of the putative class have also been injured through the exposure to PFAS Chemicals caused by Kimberly-Clark's conduct, to include subclinical injuries which have substantially increased their risk of developing cancers and other diseases known to be caused by PFAS Chemicals.  *See id.* at ¶¶ 143–150.

**************

To summarize, Plaintiffs claim that Kimberly-Clark used PFAS Chemicals in its manufacturing processes for decades, and that such processes resulted in the release of PFAS Chemicals into the environment through Kimberly-Clark's stack emissions, and through the creation of "short fiber paper sludge," a hazardous PFAS-contaminated waste byproduct that Kimberly-Clark disposed of at the nearby Kimberly-Clark Landfill.  In turn, current and former residents of New Milford, including Plaintiffs, suffer the consequences of Kimberly-Clark's improper use, storage, emittance, discharge, disposal, and/or distribution of PFAS Chemicals, which has caused contamination throughout the area.

Accordingly, the TAC sounds in seven claims: (1) negligence; (2) medical monitoring; (3) private nuisance; (4) public nuisance; (5) recklessness or willful and wanton conduct; (6) strict liability; and (7) violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq*. ("CUTPA").

**Procedural History**

On February 28, 2024, Plaintiffs filed the initial Complaint.  Compl., ECF No. 1.  On May 7, 2024, Defendant Kimberly-Clark filed a Motion to Dismiss the Complaint.  ECF No. 23.  On June 21, 2024, Plaintiffs filed an Amended Complaint.  Am. Compl., ECF No. 29.  On July 16, 2024, on consent, Plaintiffs filed their Second Amended Complaint ("SAC").  SAC, ECF No. 33.

On August 6, 2024, Defendant filed the instant Motion to Dismiss the SAC.[5]  MTD, ECF No. 35. On September 19, 2024, Plaintiffs filed the operative TAC.  ECF No. 41.  On September 20, 2024, Plaintiffs filed their opposition to the Motion to Dismiss.  *See* Pls. Opp., ECF No. 42.  Defendant filed its reply brief in further support of the Motion to Dismiss on October 29, 2024.  Reply, ECF No. 43.  On March 12, 2025, Defendant Kimberly-Clark filed a Motion for Protective Order, seeking a stay of discovery in light of the pending Motion to Dismiss.[6]  *See* ECF No. 47.  On August 7, 2025, the Court granted Defendant's Motion for Protective Order and stayed all discovery pending the Court's adjudication of the Motion to Dismiss.[7]  *See* ECF No. 53.

**Standard of Review**

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth.

---

[5]  The parties and the Court have agreed that Defendant's Motion to Dismiss shall be considered as applied to the TAC, which was filed subsequent to the Motion to Dismiss.  *See* ECF No. 40.

[6]  After the Motion for Protective Order was fully briefed, Plaintiffs sought to file a sur-reply, entirely premised on recent lab testing indicating that five vintage Kimberly-Clark Kleenex products obtained by Plaintiffs' counsel had tested positive for PFAS Chemicals.  ECF No. 50.  The Court denied Plaintiffs' Motion to File Sur-Reply, and as such, the evidence attached thereto—to include the hundreds of pages of extrinsic lab reports, has not been considered in connection with the Court's determination herein.  *See* ECF No. 51.

[7]  Notwithstanding Kimberly-Clark's request, *see* MTD at 1, the Court has determined that oral argument on the instant Motion to Dismiss is not necessary.

*Iqbal*, 556 U.S. at 678.  Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor."  *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

**Discussion**

Now before the Court is Defendant Kimberly-Clark's Motion to Dismiss, as applied to the TAC.  In seeking dismissal of the TAC, Kimberly-Clark argues: (1) that Plaintiffs, by "stacking assumption upon assumption," have failed to sufficiently allege that Kimberly-Clark is actually or proximately causing the purportedly elevated levels of PFAS Chemicals harming Plaintiffs in and around New Milford; and (2) that Plaintiffs cannot otherwise state claims for negligence, recklessness, private nuisance, public nuisance, strict liability, medical monitoring, or violations of CUTPA.  In response, Plaintiffs contend that: (a) the TAC plausibly alleges that Kimberly-Clark was the cause-in-fact and proximate cause of Plaintiffs' injuries; and (b) Plaintiffs' claims against Kimberly-Clark are otherwise sufficiently well-pled.  On balance, and for the reasons set forth herein, the Court concludes that the TAC fails to plausibly allege that Plaintiffs' injuries were caused by Kimberly-Clark.

Causation

Kimberly-Clark avers, and Plaintiffs do not appear to dispute, *see* Pls. Opp. at 24, that each of the claims asserted in the TAC require a showing of causation.  *See* MTD at 22 n.13.  The Court agrees,[8] and therefore first assesses whether Plaintiffs have adequately alleged that Kimberly-Clark's conduct caused their injuries; in other words, whether the TAC plausibly alleges that

---

[8] *See Jagger v. Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 687 n. 13 (2004) (negligence); *Cyrus v. PennyMac Loan Servs.*, No. 3:24-CV-1145 (VAB), 2025 WL 2834949, at *6 (D. Conn. Sept. 30, 2025) (CUTPA); *Dougan v. Sikorsky Aircraft Corp.*, 337 Conn. 27, 41–42 (2020) (citing *Donovan v. Philip Morris USA, Inc.*, 455 Mass. 215, 226 (2009)) (medical monitoring); *Fisk v. Town of Redding*, 164 Conn. App. 647, 653 (2016) (public nuisance); *Peterson v. iCare Mgmt., LLC*, 203 Conn. App. 777, 789 (2021) (private nuisance and recklessness); *Liss v. Milford Partners, Inc.*, No. X-07CV-044025123-S, 2008 WL 4635981, at *4 (Conn. Super. Ct. Sept. 29, 2008) (citing *Caporale v. C.W. Blakeslee & Sons, Inc.*, 149 Conn. 79, 85 (1961)) (strict liability).

Kimberly-Clark is responsible for elevated levels of PFAS Chemicals in Plaintiffs' drinking water and/or the soil on Plaintiffs' properties.

"The first component of legal cause is causation in fact.  Causation in fact is the purest legal application of legal cause.  The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct.  The second component of legal cause is proximate cause.  The test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries . . . The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection. This causal connection must be based upon more than conjecture and surmise . . . An actual cause that is a substantial factor in the resulting harm is a proximate cause of that harm . . . The finding of actual cause is thus a requisite for any finding of proximate cause." *Winn v. Posades*, 281 Conn. 50, 56–57 (2007) (cleaned up) (citing *Paige v. St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 24–26 (1999)).  "Cause-in-fact, also referred to as actual cause, asks whether there was a sufficiently close, actual, causal connection between the defendant's conduct and the actual damage suffered by the plaintiff.  It requires that there be a direct causal connection between the negligence or product defect and the injury.  That is, it refers to the physical connection between an act and an injury." *Theodore v. Lifeline Sys. Co.*, 173 Conn. App. 291, 309 (2017) (citation omitted).

In seeking dismissal of the TAC, Kimberly-Clark identifies six "speculative conclusory allegations" relied upon by Plaintiffs, which are fatal to their claims: (1) that Kimberly-Clark uses PFAS Chemicals because it manufactures products at the New Milford Facility that "traditionally" or "typically" use unspecified types of such chemicals in their manufacturing processes; (2) that Kimberly-Clark dumps PFAS Chemicals in the Kimberly-Clark Landfill because short fiber paper

sludge waste is "notorious" for being contaminated with such chemicals; (3) that the Kimberly-Clark Landfill is essentially malfunctioning, and leaching PFAS Chemicals into the groundwater and the nearby Housatonic River; (4) that Kimberly-Clark's use of PFAS Chemicals can be inferred from a single test of stormwater runoff in a public culvert across the street from the Kimberly-Clark Landfill;[9] (5) that the low levels of PFAS Chemicals purportedly (and speculatively) being leached from the Kimberly-Clark Landfill into the Housatonic River remain detectable when water from the river is subsequently used by Kimberly-Clark in its manufacturing processes; and (6) that the levels of PFAS Chemicals detected around New Milford are, in fact, elevated when compared to PFAS Chemicals found elsewhere in Connecticut. *See* MTD at 12–13. Kimberly-Clark argues that, "[t]aken together, these allegations cannot create a plausible inference that Kimberly-Clark caused Plaintiffs' harms." *See id.* at 13. The Court agrees. Plaintiffs have not adequately alleged that Kimberly-Clark is the actual or proximate cause of any elevated levels of PFAS Chemicals that are harming Plaintiffs in New Milford. The Court will address the shortcomings with Plaintiffs' various theories of causation in turn.

*The Landfill Theory*

As an initial matter, the Court concludes that Plaintiffs' Landfill Theory is both conclusory, and speculative. Plaintiffs allege that Kimberly-Clark used types of PFAS Chemicals in its manufacturing processes; that the short fiber paper sludge waste byproduct generated therefrom and dumped at the Kimberly-Clark Landfill contained unspecified PFAS Chemicals; and that such chemicals have been leaching into the groundwater surrounding the Landfill, and by extension,

---

[9] The Court acknowledges the additional testing conducted by Plaintiffs in August 2024, which was taken "just feet" from where the stormwater leaves the Kimberly-Clark Landfill, and thus, at a point in the drainage stream before any "non-Kimberly-Clark stormwater" (*i.e.*, stormwater flowing from additional catch basins not linked to the Kimberly-Clark Landfill) had entered. Plaintiffs argue that this additional testing conclusively dispels any notion that the levels of PFOA and PFOS in the drainage stream might have resulted from some non-Kimberly-Clark source. *See* Pls. Opp. at 16–18. Nevertheless, for the reasons set forth below, the additional testing from August 2024 does little to cure the speculative nature of Plaintiffs' claims.

Plaintiffs' drinking water wells.  Yet, as Kimberly-Clark argues, those allegations are premised largely on the following unsupported assumptions or speculations: (1) that Kimberly-Clark must have used types of PFAS Chemicals in its manufacturing processes in the first place, simply because it manufactured products at the New Milford Facility that "traditionally" or "typically" used such chemicals in their manufacturing process; (2) that the short fiber paper sludge in question was, in fact, "PFAS-laden," merely because such sludge is "notorious" for being contaminated with PFAS Chemicals; and (3) that Kimberly-Clark's general use of various types of PFAS Chemicals can be inferred from the presence of purportedly elevated levels of two *specific* PFAS Chemicals in stormwater runoff flowing from and/or through the Kimberly-Clark Landfill.

As an initial matter, Plaintiffs cannot plausibly allege Kimberly-Clark's actual use of PFAS Chemicals at the New Milford Facility by pointing only to the products manufactured therein, which "traditionally" or "typically" used such chemicals.  *See, e.g.*, *Hicks v. L'Oreal U.S.A., Inc.*, No. 22-CV-1989 (JPC), 2023 WL 6386847, at *8 (S.D.N.Y. Sept. 30, 2023) (general allegations about widespread use of PFAS Chemicals within a particular industry writ large cannot resolve uncertainties regarding whether, in fact, PFAS Chemicals were in a particular product); *Lowe v. Edgewell Pers. Care Co.*, 711 F. Supp. 3d 1097, 1104 (N.D. Cal. 2024) (rejecting speculation that a product's "hydrophobic components" "*must* or are *likely* to contain [PFAS Chemicals] because those chemicals are 'frequently' used to make materials water-repellant").  And this is especially true given the TAC's conclusory allegations regarding which specific PFAS Chemicals were being used at the Facility.  While Plaintiffs acknowledge that "[t]housands of PFAS Chemicals have been developed and produced," they conspicuously fail to specifically allege which of those Chemicals were actually used at the New Milford Facility, outside of conveniently asserting that

12

PFOS and PFOA—having been found in the stormwater runoff near the Kimberly-Clark Landfill—*must have* been among them.

From there, however "notorious" short fiber paper sludge may be for being "PFAS-laden," such assertions cannot nudge Plaintiffs' claims across the line from conceivable in theory, to plausible. *See Twombly*, 550 U.S. at 570. Indeed, without facts supporting the presence of specific PFAS Chemicals in the actual short fiber paper sludge waste that was generated at the New Milford Facility and dumped at the Kimberly-Clark Landfill, as opposed to short fiber paper sludge generally, the mere presence of PFOS and PFOA in stormwater runoff draining through and/or from the Landfill is insufficient, even accepting, as the Court must, that such sludge was the only waste contained at the Kimberly-Clark Landfill. *See, e.g.*, *Bond v. Solvay Specialty Polymers, USA, LLC*, No. 20-CV-8487 (NLH), 2023 WL 2237967, at *5 (D.N.J. Feb. 27, 2023) ("*Bond II*") (rejecting allegations that plaintiffs must have been exposed to PFAS Chemicals "because the chemicals have been reported at the facilities at various times, in combination with the fact that the facilities" use certain incineration processes for "unspecified waste," as "requir[ing] too many assumptions . . . to be plausible").[10]

Lastly, the notion that Kimberly-Clark used PFAS Chemicals at the New Milford Facility is too attenuated from the simple presence of PFOS and PFOA near the Kimberly-Clark Landfill. In this regard, the Court finds *SUEZ Water New York Inc. v. E.I. du Pont de Nemours & Co.* to be instructive. 578 F. Supp. 3d 511 (S.D.N.Y. 2022). There, the plaintiff, a public water company, sued several manufacturers, sellers, licensors, and/or distributors of PFAS and PFAS-containing products bringing various tort claims related to water contamination in New York involving PFAS

---

[10] Plaintiffs' efforts to distinguish the facts of the cases relied upon by Kimberly-Clark are unavailing. The factual distinctions between these cases speak little to the validity of the concerns raised therein regarding the plaintiffs' overreliance on a series of assumptions to plausibly plead causation.

Chemicals, specifically PFOA and PFOS. *See generally id.* SUEZ alleged that the defendants knowingly and willfully placed raw PFAS Chemicals, as well as products containing such chemicals, into the stream of commerce in New York State, where such products and solutions were used and disposed of by manufacturers, distributors, and consumers, resulting in contamination to natural resources throughout New York State, including the water sources that SUEZ used to provide drinking water. *Id.* at 523. The district court dismissed the allegations as "too attenuated and speculative to state a claim for relief," insofar as: (a) "most of the allegations relate to PFAS as a class and not to the specific chemicals that are alleged to have caused SUEZ harm"; and (b) the theory that "end-use customers" disposed of products containing the defendants' PFAS Chemicals into waterways within SUEZ's source watersheds was "even more speculative and attenuated." *See id.* at 542–43. The TAC's shortcomings are similar. Indeed, as in *SUEZ*, in terms of Kimberly-Clark's manufacturing processes, most of Plaintiffs' allegations relate to PFAS Chemicals generally, and not to the specific chemicals found in the nearby groundwater and soil that are alleged to have caused Plaintiffs harm (*i.e.*, PFOS and PFOA), or any other PFAS Chemicals. Moreover, as with the "end-user" theory in *SUEZ*, the Landfill Theory, even when considered in combination with Plaintiffs' stormwater runoff testing, relies on speculation as to the presence and quantity of "types" of PFAS Chemicals within the short paper fiber sludge dumped at the Kimberly-Clark Landfill.

The Court acknowledges that dismissal is not justified merely because certain things are unknown at the pleadings stage, *e.g.*, whether Plaintiffs ultimately will be able to prove that Kimberly-Clark used PFAS Chemicals in its manufacturing processes at the New Milford Facility, and that such Chemicals later leached into the nearby soil and/or water supply through the short fiber paper sludge waste byproduct dumped at the Kimberly-Clark Landfill. *See Locust Valley*

14

*Water Dist. v. Dow Chem. Co.*, 465 F. Supp. 3d 235, 241 (E.D.N.Y. 2020).  But while "detailed factual allegations are not required to survive a motion to dismiss, the allegations still must be sufficient to make [Plaintiffs'] claim[s] plausible."  *SUEZ*, 578 F. Supp. at 541.  And here, "the allegations in the [TAC] as to causation do not meet this threshold."  *Id.*  Though the TAC asserts that "Kimberly-Clark used PFAS Chemicals, including PFOA and PFOS, in is manufacturing processes at the New Milford Facility," these allegations are premised upon assumptions.  And the TAC is bereft of any specific factual allegations regarding, for example:  whether any PFAS manufacturer sold PFAS Chemicals to Kimberly-Clark (and which types); how such (and which such) PFAS Chemicals used by Kimberly-Clark end up in the short fiber paper sludge that is later dumped at the Kimberly-Clark Landfill; reports or testing as to the actual contents of such short fiber paper sludge (as opposed to the purported leachate therefrom); any other sources of stormwater upgradient from the Kimberly-Clark Landfill that might (or might not) be contributing to the purportedly elevated PFOS and PFOA levels found in the Kimberly-Clark drainage stream; or whether the levels of PFOS and PFOA found in stormwater runoff from the Kimberly-Clark Landfill are, in fact, elevated relative to those found in other water sources throughout Connecticut. Without more, Plaintiffs' conclusory assertions that Kimberly-Clark used unspecified various types of PFAS Chemicals and dumped "PFAS-laden" short fiber paper sludge at the Kimberly-Clark Landfill, which then malfunctioned and leached PFAS chemicals into the surrounding soil and water, are too attenuated from the purportedly elevated levels of PFOS and PFOA later found

15

in the Kimberly-Clark drainage stream, and even more attenuated from the purportedly elevated levels of PFOS and PFOA found in nearby drinking water wells.[11]

### The Emissions Theory

Plaintiffs' Emissions Theory fares no better. The TAC alleges that Kimberly-Clark's smokestacks were emitting PFAS Chemicals and dispersing them onto properties (and subsequently into drinking wells) throughout New Milford, as a result of "insufficient filtering of PFAS-laden dust produced by paper and diaper machines which was then exhausted into the atmosphere." TAC at ¶¶ 88–89. Again, these allegations are largely conjectural. First, the Court reiterates that Plaintiffs' allegations as to the initial presence of PFAS Chemicals at the New Milford Facility are insufficient to the extent they are premised on the notion that Kimberly-Clark manufactured products at the Facility that "traditionally" or "typically" used such chemicals. *See supra* at 12. Next, the Emissions Theory relies on another speculative assumption that the smokestack at the New Milford Facility emitted PFAS Chemicals merely because other smokestacks at other facilities in other states were confirmed to be emitting PFAS. Once again, without specific facts supporting the claim that Kimberly-Clark used PFAS Chemicals at the New Milford Facility, references to other PFAS-emitting smokestacks are not enough. *See, e.g.*, *Bond II*, 2023 WL 2237967 at *4 (plaintiffs' discussion of "incineration generally, without any reference

---

[11] Additionally, Kimberly-Clark accurately observes that the TAC does not "explain how it can be that each Plaintiffs' property is contaminated with different PFAS chemicals but the source of the PFAS contamination (allegedly Kimberly-Clark) is the same." MTD at 32. This is telling. Indeed, common sense indicates that to the extent elevated levels of certain PFAS Chemicals are attributable to Kimberly-Clark's use of such chemicals in its manufacturing processes, the same combination of PFAS Chemicals (*e.g.*, PFOS + PFOA) should be present in each of tests conducted by Plaintiffs. And yet, Plaintiffs' tests reflect varying combinations of PFAS Chemicals when taken at different locations, and from different sources (soil vs. water wells). The Court acknowledges that there may well be valid explanations as to why the combination of identifiable PFAS Chemicals found at Plaintiff DePaul's property differ from the combination of identifiable PFAS Chemicals found at Plaintiff Meriweather's property, and why such discrepancies might bear little on Kimberly-Clark's use of such PFAS Chemicals. But the TAC posits no such explanations for these discrepancies, which only serves to highlight the speculative nature of Plaintiffs' claims.

to how often the incinerators were used or what kind of waste was incinerated," "lack[ed] factual specificity").

*Continuous Cycle of Pollution*

Insofar as the Court has rejected the plausibility of both the Landfill Theory and the Emissions Theory, it has necessarily dispelled the related concept that either the allegedly PFAS-laden leachate flowing from the Kimberly-Clark Landfill into the Housatonic River, or the allegedly PFAS-laden emissions traveling from the New Milford Facility into the Housatonic River, and drawn therefrom back into the New Milford Facility, are creating a "continuous cycle of pollution." Notwithstanding, even accepting the viability of such theories, Plaintiffs' Continuous Cycle Theory remains hopelessly flawed. Indeed, it is utterly speculative to assert that the PFAS-laden leachate from the Kimberly-Clark Landfill (which, by Plaintiffs' own admission, becomes substantially diluted by runoff from other sources before it finally leaves the drainage stream) enters the Housatonic River, flows several miles downstream, and yet when drawn in by the New Milford Facility still contains dangerous levels of PFAS chemicals.[12] The same is true of the Emissions Theory. It is conjecture to assert that the unspecified PFAS Chemicals allegedly contained in the smokestack emissions, waft down into the Housatonic River and are then drawn into the New Milford Facility at elevated levels as a result. Relatedly, and perhaps more importantly, Plaintiffs have conspicuously failed to allege that even traceable (much less elevated, or dangerous) levels of PFAS Chemicals have actually been detected in the water from the Housatonic River at or near the point at which it is drawn for use at the New Milford Facility. Instead, Plaintiffs speculate that because PFOS is known to "cling to organics," the PFOS leaching

---

[12] The TAC does not offer any explanation as to how the PFAS-laden leachate/emissions purportedly entering the Housatonic River are not instantaneously or soon thereafter diluted to untraceable levels by the hundreds of millions of gallons of water that flow down the Housatonic River.

into the Housatonic River is "bounding to river sediments," where it can "remain bound and be released into the water over an indefinite period of time."[13]  *See* TAC at ¶ 68.  But isolated allegations about what PFOS can or might do in terms of "clinging to organics" sheds no light on what is actually happening in New Milford or the Housatonic River.  In sum, the Court is persuaded that such allegations do not plausibly support the inference that Kimberly-Clark is responsible, in fact, for any elevated levels of PFAS Chemicals in and around New Milford. And insofar as a "finding of actual cause is . . . a requisite for any finding of proximate cause," *Winn*, 281 Conn. at 56–57, it is similarly established that Plaintiffs have not plausibly alleged that Kimberly-Clark is the proximate cause of Plaintiffs' injuries.[14]  Nevertheless, the Court further assesses Plaintiffs' allegations as to proximate cause.

"Because actual causation, in theory, is virtually limitless, the legal construct of proximate cause serves to establish how far down the causal continuum tortfeasors will be held liable for the consequences of their actions." *First Federal Savings & Loan Assn. of Rochester v. Charter Appraisal Co.*, 247 Conn. 597, 604 (1999).  "Proximate cause requires that the defendant's conduct was a substantial factor in bringing about the plaintiff's injuries and that there was an unbroken sequence of events that tied the plaintiff's injuries to the defendant's conduct." *Stephens v. Ballek*, No. UWY-CV17-6037407-S, 2023 WL 4882546, at *3 (Conn. Super. Ct. July 24, 2023) (cleaned

---

[13]  Notably, the TAC says nothing about the ability of PFOA specifically to "cling to organics."  And if PFOA were unable to do so, Plaintiffs do not plausibly explain how PFOA remains one of the PFAS Chemicals purportedly still contaminating the New Milford area as part of the Continuous Cycle Theory.

[14]  Plaintiffs argue that Kimberly-Clark's truthful denial of their allegations "would dismantle this case entirely," and "[y]et, despite presenting the Court with reams of extrinsic evidence, Kimberly-Clark conspicuously refuses to deny these critical facts."  Pls. Opp. at 10.  This argument misses the mark.  Indeed, it is Plaintiffs' burden in the first instance to plausibly allege their claims, and it is well-settled that a plaintiff's allegations are accepted as true for purposes of a motion to dismiss.  In other words, the actual truth of Kimberly-Clark's use of PFAS Chemicals at the New Milford Facility is immaterial at the pleadings stage, as is Kimberly-Clark's failure to outright deny the use of such Chemicals.  What matters is whether Plaintiffs' allegations, accepted as true, are sufficient to state a claim.  And here, the TAC's failure to plausibly allege Kimberly-Clark's conduct as being the actual and proximate cause of Plaintiffs' injuries is fatal to each of Plaintiffs' claims.

up) (citing *Winn*, 281 Conn. at 56).  Yet, "[p]roximate cause does not require the plaintiff to remove from the realm of possibility all other potential causes of the accident."  *Id.* (citing *Hicks v. State*, 287 Conn. 421, 438 (2008)).  Indeed, two or more discreet events can be the proximate cause of a single injury.  *See Ventry v. Charlotte Hungerford Hosp.*, No. LLI-CV17-6014670-S, 2022 WL 375666, at *7 (Conn. Super. Ct. Jan. 20, 2022) ("[N]egligent conduct can be a proximate cause of an injury if it is not the only cause, or even the most significant cause of the injury, provided it contributes materially to the production of the injury, and thus is a substantial factor in bringing it about.") (quoting Connecticut Civil Jury Instructions, § 3.1-2).

Here, even if PFAS-laden leachate and/or emissions produced by Kimberly-Clark were the actual cause of the PFAS Chemicals found in Plaintiffs' drinking water wells, the Court is nevertheless unpersuaded that the TAC adequately alleges that Kimberly-Clark's conduct was a substantial factor in Plaintiffs' purported injuries.  Indeed, any allegation that such levels of PFAS Chemicals were, in fact, elevated, is rendered entirely speculative, if not conclusively dispelled, by judicially noticeable testing conducted by Aquarian Water Company in Connecticut between 2019 and 2023, which reflects similar levels of PFOA and PFOS in drinking water wells across Connecticut.  *See* MTD, Ex. A, at 8–12.[15]  For example, PFOS and PFOA levels in drinking well water tested in Danbury, Darien, New Fairfield, and Woodbury were within (or in some cases,

---

[15] Kimberly-Clark attaches to its Motion to Dismiss a copy of the complaint filed in *Vincent, et al. v. Aquarian Water Company of Connecticut*, Case No. UWY-CV23-6073975-X06, a case proceeding in Connecticut Superior Court. The complaint in *Vincent* cites directly to the raw sampling results from Aquarian's voluntary testing of its water sources in Connecticut. Kimberly-Clark's Motion to Dismiss, in turn, also cites to Aquarian's sampling data. Though Kimberly-Clark argues that this Court "can take judicial notice of public filings and internet material," *see* MTD at 27 n.21, it is well-settled that courts "may take judicial notice of a document filed in another court *not for the truth of the matters asserted in the other litigation*, but rather to establish the fact of such litigation and related filings." *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (emphasis added). Thus, the Court cannot take judicial notice of Aquarian's testing data, insofar as it is derived from the *Vincent* complaint. Nevertheless, it is true that "the Court generally has the discretion to take judicial notice of internet material." *Boarding Sch. Rev., LLC v. Delta Career Educ. Corp.*, No. 11-CV-8921 (DAB), 2013 WL 6670584, at *9 (S.D.N.Y. Mar. 29, 2013). The Court exercises such discretion here, and elects to take judicial notice of the laboratory certified sampling data publicly provided by Aquarian, a public water supply company, on its website. *See What is PFAS?*, Aquarion Water Company, https://www.aquarionwater.com/water-quality/learn-about-pfas/ct-pfas-faqs (last visited March 27, 2026).

19

above) a range of 4 ng/L to 15 ng/L, *i.e.*, the approximate range of levels found in Monitoring Well B, and in Plaintiffs' drinking water wells. *See id.* Insofar as the PFAS levels found in Plaintiffs' drinking water are not actually elevated from those found in drinking water wells all over Connecticut (to include towns many miles away from New Milford), Plaintiffs have not plausibly alleged that Kimberly Clark's use of PFAS Chemicals in its manufacturing processes was a substantial factor in the subclinical injuries suffered by Plaintiffs as a result of the PFAS Chemicals present in their drinking water.

For the foregoing reasons, the Court concludes that the allegations set forth in the TAC are "insufficient to state a claim as to causation, or to 'nudge[] [Plaintiffs'] claims across the line from conceivable to plausible.'" *SUEZ*, 578 F. Supp. 3d at 544 (quoting *Twombly*, 550 U.S. at 570). As such, each of Plaintiffs' claims must be dismissed.

### Leave to Amend

Having determined that the TAC will be dismissed in its entirety, the Court must additionally evaluate whether to permit Plaintiffs leave to further amend their pleading. In its discretion, the Court declines to do so. Rule 15(a)(2) provides that a court should freely give leave to amend "when justice so requires." *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend may be denied, however, if the amendment would be futile." *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 240 (S.D.N.Y. 2018) (citation omitted). "Leave to amend may also be denied 'when a party has been given ample prior opportunity to allege a claim.'" *Id.* (quoting *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 72 (2d Cir. 1996)); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("repeated failure to cure deficiencies by amendments previously allowed" constitutes grounds for denying amendment). "It is within the sound discretion of the district court to grant or deny leave to amend." *WC Capital Mgmt.*,

*LLC v. UBS Sec., LLC*, 711 F.3d 322, 334 (2d Cir. 2013) (internal quotation marks and citation omitted).

Here, as an initial matter, the Court observes that Plaintiffs' opposition to the instant Motion to Dismiss does not indicate whether they are seeking leave to file a fourth amended complaint. Nevertheless, even if it had, the Court would still be disinclined to permit leave to amend, given the ample prior opportunity afforded to Plaintiffs to allege a viable claim. *See De Jesus*, 87 F.3d at 72. Moreover, given the Court's rejection herein as to each of Plaintiffs' various causal theories, it is unclear how a further opportunity to amend would result in a pleading that could pass Rule 12(b)(6) muster. For these reasons, the TAC is dismissed without leave to amend.

**Conclusion**

For all of the foregoing reasons, Defendant Kimberly-Clark's Motion to Dismiss is **GRANTED**. The Third Amended Complaint is **DISMISSED without further leave to amend.** The Clerk of Court is directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 27th day of March 2026.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE
